2005 UT 11

**STATE of Utah, Plaintiff and Appellee,**

v.

**Paul Christopher ALLEN, Defendant and Appellant.**

No. 20000531.

Supreme Court of Utah.

Feb. 11, 2005.

Rehearing Denied Feb. 16, 2005.

Mark L. Shurtleff, Att'y Gen., Kenneth A. Bronston, Asst. Att'y Gen., Salt Lake City, and William K. McGuire, Farmington, for plaintiff.

Todd A. Utzinger, Scott L. Wiggins, Salt Lake City, for defendant.

DURRANT, Justice:

¶ 1 Defendant Paul Christopher Allen appeals his conviction for aggravated murder. He argues that numerous prejudicial errors occurred during the course of his trial and requests that this court reverse his conviction. We affirm.

## BACKGROUND

¶ 2 "On appeal from a jury verdict, we view the evidence and all reasonable inferences in a light most favorable to that verdict and recite the facts accordingly." *State v. Gordon*, 913 P.2d 350, 351 (Utah 1996).

¶ 3 On the evening of August 28, 1996, police were called to Allen's North Salt Lake City apartment, where they discovered Allen and the lifeless body of Allen's wife, Jill, lying on the hallway floor. Blood spatter covered the walls near Jill's body, and the carpet beneath her was soaked with blood. Jill's belt was broken and her clothing was pushed back, exposing her body from neck to ankles. The contents of her purse had been dumped out and scattered across the kitchen counter. A baseball bat lay in the doorway of a nearby bedroom.

¶ 4 Although the evidence at the scene indicated that there had been a struggle, there was no sign of forced entry through any of the apartment's doors or windows. A forensic pathologist later certified Jill's cause of death as the result of strangulation and blunt force trauma to the head. Despite indications that would suggest otherwise, the pathologist determined that there was no evidence of sexual assault.

¶ 5 Sergeant John Herndon, the lead investigator on the case, pursued several leads in the months following Jill's murder without success before Brandon Nicholsen came forward with information about the homicide. Nicholsen informed Sergeant Herndon that he, Nicholsen, had helped a coworker, George Anthony Taylor, dispose of evidence

related to the murder of a woman in North Salt Lake.

¶ 6 In exchange for immunity for his part in the crime, Nicholsen recounted that three weeks before Jill's murder, Taylor had told him that he, Taylor, and another man, Joseph Wright, had been hired by a "Paul" to kill Paul's wife, and that Taylor would receive between $5,000 and $10,000 for his part in the murder. When Nicholsen confronted Taylor about his involvement after hearing a television report about Jill's murder, Taylor admitted to the killing. Taylor told Nicholsen that he entered Jill's home with a key provided by Allen. When the gun he had intended to shoot her with misfired, Taylor explained that he struck Jill in the head first with the gun and later with a baseball bat before he finally strangled her to death. Taylor later admitted that he had emptied the contents of Jill's purse and staged her body to make it look like a robbery and a sexual assault.

¶ 7 Following Nicholsen's disclosures, police arrested Taylor for Jill's murder. When Taylor confessed to his part in the murder and implicated Wright, police also arrested Wright.

¶ 8 Wright confessed to police that Allen had first approached him near the end of 1995 and indicated that he, Allen, knew someone at his work who wanted "a guy" killed for $10,000. When Allen asked if Wright was interested, Wright told Allen that he would "see what [he] could do." Sometime later, Allen told Wright specifically that he was having problems in his marriage and that he wanted his wife, Jill, killed. Allen stated that he would pay Wright $30,000 out of Jill's $50,000 life insurance policy for the murder. Wright agreed to the proposal, and the two thereafter discussed various methods of committing the murder and finding someone to do the job. In April 1996, Taylor agreed to murder Jill.

¶ 9 Wright testified that, to facilitate the murder, Allen paid Wright in cash at various times before and after the killing in an amount totaling between $14,000 and $16,000. Wright stated that Allen promised to pay the balance owing to Wright when Allen's negotiations with the insurance company were resolved.

¶ 10 Following the police investigation, the State charged Allen with aggravated murder, conspiracy to commit aggravated murder, and criminal solicitation in connection with Jill's murder.[1] A jury found Allen guilty of aggravated murder at the conclusion of Allen's trial, and Allen was sentenced to life with the possibility of parole.

¶ 11 On appeal, Allen identifies numerous errors that he alleges occurred during his trial. Specifically, he raises six issues that, according to Allen, warrant reversal of his conviction. Because several of these issues are inadequately briefed, however, we address only whether the district court abused its discretion in (1) allowing the State to introduce evidence under Utah Rule of Evidence 404(b) that Allen had made fraudulent credit card purchases, (2) refusing to grant a mistrial after Wright testified that Allen had been asked by the police to take a lie detector test, and (3) refusing to grant a new trial based on juror misconduct.[2] We have jurisdiction pursuant to Utah Code section 78-2-2(3)(i) (2002).

## ANALYSIS

### I. UTAH RULE OF EVIDENCE 404(b)

¶ 12 We first examine Allen's contention that the district court abused its discretion under Utah Rule of Evidence 404(b) when it admitted evidence showing that Allen had made fraudulent credit card purchases both preceding and following his wife's murder.

1. The State also charged Allen with filing a false or fraudulent insurance claim, which was later dismissed.

2. Because they are inadequately briefed, we do not address the remaining issues raised by Allen on appeal relating to (1) the district court's refusal to grant a mistrial after a witness testified that Allen had retained an attorney prior to his arrest, (2) the district court's reasonable doubt jury instruction, and (3) cumulative error. *See, e.g., Smith v. Four Corners Mental Health Ctr., Inc.,* 2003 UT 23, ¶ 46, 70 P.3d 904 (declining to address an inadequately briefed argument).

¶ 13 During Allen's trial, the State was allowed to introduce evidence that, while employed as an AT & T sales representative, Allen misappropriated confidential credit information from at least two of his clients and used this information to fraudulently obtain credit cards and purchase several personal items from various retailers, including JC Penney, Pro Golf, Uintah Golf, and the Bombay Company.[3] Wright also testified that Allen had told him that he, Allen, was using stolen credit cards from his AT & T clients to make purchases at several different locations in order to account for the discretionary income he was using to pay Wright.

¶ 14 Allen argues that the district court abused its discretion under Utah Rule of Evidence 404(b) when it permitted the State to introduce evidence of Allen's fraudulent purchases. The State counters that the district court did not abuse its discretion for two reasons. First, it asserts that the evidence of Allen's fraudulent purchases does not implicate rule 404(b) since it was introduced not as evidence of *other* crimes, wrongs, or acts," Utah R. Evid. 404(b) (emphasis added), but as an act committed directly in furtherance of the charged conspiracy. In support of this assertion, the State cites several federal cases in which courts have concluded that rule 404(b) of the Federal Rules of Evidence applies only "to evidence of acts extrinsic to the crime charged." *United States v. Green,* 175 F.3d 822, 831 (10th Cir.1999) (internal quotations omitted); *accord, e.g., United States v. Alexander,* 331 F.3d 116, 125 (D.C.Cir.2003) ("Rule 404(b) applies only to 'extrinsic' evidence of other crimes and not to 'intrinsic' evidence of the same crime."); *United States v. Abrego,* 141 F.3d 142, 175 (5th Cir.1998) ("[E]vidence of acts committed pursuant to a conspiracy and offered to prove the defendant's membership or participation in the conspiracy are not extrinsic evidence, i.e., evidence of 'other' acts, for purposes of Rule 404(b)." (internal quotations omitted)). Alternatively, the State argues that the district court did not

abuse its discretion because the evidence of Allen's fraudulent purchases satisfies the requirements of Utah Rule of Evidence 404(b).

¶ 15 We need not consider whether the evidence of Allen's fraudulent purchases was admissible as "intrinsic evidence" under a federal analysis because we conclude that it was admissible under a traditional Utah Rule of Evidence 404(b) analysis. When examining a district court's decision to admit evidence under Utah Rule of Evidence 404(b), we review for an abuse of discretion. *State v. Nelson–Waggoner,* 2000 UT 59, ¶ 16, 6 P.3d 1120. In so doing, "[w]e review the record to determine whether the admission of other bad acts evidence was scrupulously examined by the [district] judge in the proper exercise of that discretion." *Id.* (internal quotations omitted).

¶ 16 Utah Rule of Evidence 404(b) provides that

[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

Utah R. Evid. 404(b). We have held that rule 404(b) allows for the introduction of bad acts evidence if the evidence satisfies the following three criteria: (1) the evidence is offered for a proper, noncharacter purpose, such as one of those listed in rule 404(b); (2) the evidence meets the requirements of rule 402; and (3) the evidence meets the requirements of rule 403. *Nelson–Waggoner,* 2000 UT 59 at ¶¶ 18–20, 6 P.3d 1120 (citing *State v. Decorso,* 1999 UT 57, ¶¶ 21–22, 29, 993 P.2d 837). We examine each of these criteria in turn.

*A. Proper, Noncharacter Purpose*

¶ 17 Under the first part of a rule 404(b) analysis, a court must make an initial determination as to whether the bad acts

---

**3.** Specifically, the State introduced various fraudulent applications for store credit and receipts evidencing Allen's fraudulent purchases, which included, among others items, golf clubs and various golf accessories, a king-size bed, and several hundred dollars worth of bedding. The State also introduced phone records showing that Allen had used his cellular phone to place calls to the Bombay Company where one of the fraudulent purchases was made.

evidence is being offered for a proper, non-character purpose. *Id.* at ¶ 18. Rule 404(b) lists several purposes for which evidence of other crimes, wrongs, or acts may be admitted, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Utah R. Evid. 404(b). This list is not exhaustive, however, and evidence demonstrating other purposes is not precluded so long as the evidence is offered for a legitimate purpose other than to show the defendant's propensity to commit the crime charged. *See State v. Houskeeper*, 2002 UT 118, ¶¶ 27–28, 62 P.3d 444; *State v. Fedorowicz*, 2002 UT 67, ¶¶ 26–27, 52 P.3d 1194.

¶ 18 Here, the district court found that if the evidence of Allen's fraudulent purchases came in as the State anticipated, "the evidence would be relevant for an appropriate purpose and non-character purpose; that is, intent, preparation, plan and knowledge." The court also reasoned that the fraudulent purchases were proper, noncharacter evidence of the conspiracy with which Allen was charged. We reject Allen's assertion that the district court abused its discretion in concluding that the fraudulent purchase evidence was admissible for these proper and noncharacter purposes.

¶ 19 First, it is evident that the State introduced the fraudulent purchases not to show that Allen had a propensity to commit crime, but rather, to establish that Allen had engaged in a conspiracy to murder his wife and that he had employed Wright as a middleman in order to facilitate this action. The fraudulent purchases were direct evidence of acts Allen committed in furtherance of the conspiracy and demonstrated the means by which Allen sought to conceal his payments to Wright.[4]

¶ 20 Additionally, the evidence regarding Allen's fraudulent transfers was also admitted for the proper, noncharacter purposes of proving preparation, plan, intent, and knowledge. This evidence demonstrated how Allen planned to account for his own discretionary spending and thereby disguise his payments to Wright. It also was connected with the advance payments Allen made to Wright in preparation for the murder, and illustrated that Allen knowingly engaged in the conspiracy with the intent to murder his wife.

¶ 21 Because the State introduced evidence of Allen's fraudulent purchases for these legitimate reasons and not simply to show that Allen had a propensity to commit crime, the district court did not abuse its discretion in concluding that the State's evidence was introduced for a proper, noncharacter purpose under rule 404(b).

### B. Relevance Under Rule 402

¶ 22 Even if evidence is offered for a proper, noncharacter purpose, a court must also determine whether the evidence is relevant under Utah Rule of Evidence 402. *Nelson–Waggoner*, 2000 UT 59 at ¶ 19, 6 P.3d 1120. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Utah R. Evid. 401.

¶ 23 Here, the district court did not abuse its discretion in determining that the evidence of Allen's fraudulent purchases was relevant to the question of whether Allen had conspired to kill his wife. As the district court accurately observed, the evidence of how Allen concealed his payments to Wright corroborated Wright's account of the events and therefore ultimately supported the State's allegation that Allen had conspired with Taylor and Wright to murder his wife. The evidence of Allen's fraudulent purchases made the existence of a conspiracy and the actions taken in furtherance thereof more probable than if the evidence were not admitted.

---

4. Allen repeatedly argues that the State has failed to establish "any connection" between Allen's fraudulent purchases and his conspiracy to murder Jill. This is incorrect. Wright clearly testified during trial that Allen had represented to Wright that he, Allen, was using his clients' stolen information to make fraudulent purchases from various stores in order to account for the money he was paying to Wright. Wright's testimony therefore directly linked Allen's fraudulent purchases to the conspiracy.

### C. Probative Value Versus Prejudicial Effect Under Rule 403

¶ 24 Finally, even if evidence is offered for a proper, noncharacter purpose and is relevant, a district court must determine whether the probative value of the evidence " 'is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.' " *Nelson–Waggoner*, 2000 UT 59 at ¶ 20, 6 P.3d 1120 (quoting Utah R. Evid. 403). In considering whether to exclude otherwise admissible evidence under rule 403, we have stated that a district court should evaluate several factors, including

> the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

*Decorso*, 1999 UT 57 at ¶ 29, 993 P.2d 837 (quoting *State v. Shickles*, 760 P.2d 291, 295–96 (Utah 1988) (further citation omitted)). We hereinafter refer to these factors as the "*Shickles* factors."

¶ 25 Allen argues that the district court abused its discretion in allowing evidence of the fraudulent purchases to be admitted because, according to Allen, the record lacks "any indication" that the district court gave "any real consideration of the matters to be considered in the course of performing" the requisite balancing required by rule 403. He argues that, without evidence that the district court examined and considered the various *Shickles* factors described above, we must conclude that the district court erred in allowing the State to introduce evidence of Allen's fraudulent purchases. We disagree.

¶ 26 A review of the record demonstrates that the district court carefully balanced the probative value of the evidence against its prejudicial effect. Although the court acknowledged that the fraudulent purchase evidence would connect Allen with an uncharged wrong, it reasoned that such connection did not render the evidence inadmissible. The court explained that the probative value of the fraudulent purchases as direct evidence of Allen's participation in a conspiracy to commit murder was significant and relevant to showing Allen's preparation, plan, knowledge, and intent. Moreover, the court did not find the evidence to be particularly inflammatory or egregious.

¶ 27 The record also reveals that the district court sought to minimize any confusion that introduction of the fraudulent purchase evidence may have caused by instructing the jury that the evidence was "not to be considered ... to prove that [Allen was] a person of bad character or that he ha[d] a disposition to commit crimes," but rather "only for the limited purpose of determining if it tend[ed] to show: proof of motive, opportunity, intent, preparation, plan, knowledge, or absence of mistake." Additionally, the introduction of the evidence did not cause unnecessary delay, since the State introduced the majority of its evidence relating to Allen's fraudulent credit card applications and purchases through stipulated exhibits, and all other references made of Allen's fraudulent activities were relatively brief.

¶ 28 We acknowledge that, in reaching its conclusion that the probative value of the fraudulent purchase evidence was not substantially outweighed by its prejudicial effect, the district court did not explicitly identify the *Shickles* factors referenced in *Decorso*. However, it is evident that the district court relied extensively on *Decorso* in making all three inquiries required by rule 404(b). Moreover, we can find no relevant *Shickles* factor that would lead us to believe the district court abused its discretion in allowing the State to introduce the fraudulent purchase evidence.

¶ 29 First, the need for the evidence was significant. The fraudulent purchases were direct evidence of Allen's participation in the conspiracy and corroborated the testimony of Wright, a key witness for the State, that Allen had paid Wright to arrange for Jill's murder.

¶ 30 Second, the evidence that Allen had, in fact, stolen personal client information and used it to make fraudulent purchases was

strong. Police were alerted to Allen's fraudulent activities only after Wright indicated that Allen was disguising the payments used to facilitate Jill's murder by using stolen credit cards to purchase personal property from the Bombay Company, JC Penney, Uintah Golf, and Pro Golf. Police confirmed the veracity of this account after an investigation revealed that someone had fraudulently used the credit of two of Allen's clients at these specific stores to purchase various items in the period leading up to and following Jill's death. Moreover, Allen made no attempt to refute this testimony and explicitly stipulated to the introduction of evidence establishing his fraudulent activities during trial.

¶ 31 Third, the fraudulent purchases were made contemporaneously with the conspiracy. Although the purchases do not correspond exactly with the payments Allen made to Wright for Jill's murder,[5] the fraudulent purchases, like the payments to Wright, occurred leading up to and following the murder.

¶ 32 Fourth, evidence of the fraudulent purchases was needed to demonstrate that the money Wright received for his participation in the conspiracy came from Allen, not another source. It would have been difficult for the State to have corroborated Wright's testimony and established this link as effectively through alternative methods of proof.

¶ 33 Finally, it is unlikely that Allen's involvement in fraudulent activities would have roused the jury to overmastering hostility, especially in light of the gravity of the offenses for which he was charged. Contrary to Allen's assertions, we do not believe a juror who had reasonable doubt of Allen's participation in Jill's murder would nevertheless have been more likely to convict Allen on such a weighty charge simply because he or she desired to punish him for his prior, relatively minor fraudulent acts.

¶ 34 In sum, because the evidence of Allen's fraudulent purchases was admitted for a proper, noncharacter purpose, was relevant, and had probative value that was not substantially outweighed by its prejudicial effect, the district court did not abuse its discretion in allowing the State to introduce the evidence during Allen's trial.

## II. WRIGHT'S REFERENCE TO A LIE DETECTOR TEST

¶ 35 We next address Allen's contention that the district court abused its discretion in refusing to grant a mistrial after Wright made an improper comment during the course of his testimony.

¶ 36 During the State's examination of Wright, the following exchange took place:

Q. What, if anything, did you and Paul discuss about the nature of your telephone conversation after Jill's death?

A. We just made it seem—we talked about what the investigators were coming out to talk to me about, things like that. Paul would reassure me that these things were happening to all of his friends and don't worry about it. You don't got nothing to worry about, you haven't done anything. They're going to continue to do this. Things like that. *He had told me that they had asked him to come in for a lie detector test.*

(Emphasis added.) Allen allowed the State's examination to continue briefly following this statement before requesting a bench conference and asking the court for an opportunity to request a mistrial. Upon conclusion of the State's direct examination, Allen moved for a mistrial, arguing that the State had inappropriately and prejudicially elicited the lie detector reference from Wright.

¶ 37 The district court denied Allen's motion. Given the context in which it was made, the court did not find the lie detector reference to have been intentionally elicited or planned. Because Wright made the state-

---

**5.** Allen argues that because the cash payments and dates on which they were made to Wright do not directly correspond "line by line" to the dates upon and the amounts in which the fraudulent purchases were made, the purchases provide no proof of Allen's role in the conspiracy to commit the murder. We disagree. The State did not need to establish such an exacting correlation for a jury to reasonably conclude that the fraudulent purchases made before and after Jill's death were connected to the payments Allen made to Wright.

ment in passing and neither party attracted attention to it, the court concluded that the statement was "simply innocuous" and would not prejudice the jury. The court did offer to give a curative instruction regarding the comment, however, which Allen declined.

¶ 38 On appeal, Allen argues that Wright's reference to a lie detector test "most likely caused the jury to speculate about why the results of [Allen's] polygraph examination were not placed into evidence or discussed at trial," and that "[s]uch speculation logically led the jury to conclude that he was trying to hide the negative results of the lie detector test." He argues that this reference prejudiced his right to a fair trial, and that as a result the district court abused its discretion when it denied Allen's request for a mistrial.[6] We disagree.

¶ 39 Because a district judge is in an advantaged position to determine the impact of courtroom events on the total proceedings, once a district court has exercised its discretion and denied a motion for a mistrial, we will not reverse the court's decision unless it "is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial." *State v. Wach*, 2001 UT 35, ¶ 45, 24 P.3d 948. Applying this standard in this case, we cannot conclude that the district court abused its discretion in refusing to grant a mistrial.

¶ 40 A review of our case law amply reveals that a mistrial is not required where an improper statement is not intentionally elicited, is made in passing, and is relatively innocuous in light of all the testimony presented. For example, in *State v. Butterfield*, 2001 UT 59, 27 P.3d 1133, we held that a district court did not abuse its discretion in refusing to grant a mistrial after a witness testified that he had obtained the defendant's photograph from the Salt Lake County Jail. *Id.* at ¶ 47. We explained that the statement was not intentionally elicited, was "vague"

and "fleeting," and the defendant could not point to evidence in the record suggesting that the jury had relied on the witness's statement. *Id.*

¶ 41 Similarly, in *Wach*, we held that a district court did not abuse its discretion where it declined to grant a mistrial after a witness violated the parties' previous stipulation by introducing evidence of the defendant's prior bad acts. 2001 UT 35 at ¶¶ 44–46, 24 P.3d 948. We reasoned that the statement was "not elicited by the prosecutor," was an "isolated, off-hand remark, buried in roughly 244 pages of testimony," and was "not necessarily inflammatory." *Id.* at ¶ 46.

¶ 42 Finally, in *State v. Decorso*, 1999 UT 57, 993 P.2d 837, we concluded that a district court's refusal to grant a mistrial after a witness made improper references to other crimes the defendant had committed was not an abuse of discretion. *Id.* at ¶ 38. We explained that the reference to other crimes was "vague" and "came only after a lengthy direct examination and lengthy cross-examination," and that the proceedings "move[d] along without undue interruption and directed the jury's attention to other matters." *Id.* at ¶ 39; *see also State v. Griffiths*, 752 P.2d 879, 881, 883 (Utah 1988) (holding a district court did not commit reversible error by allowing a witness to improperly state that the defendant possessed an outstanding warrant on another offense because the statement was unintentionally elicited, was "very brief" and "only made in passing," provided no details of why the warrant was issued or to which offense it was related, and the district court admonished the jury to disregard the statement); *State v. Case*, 547 P.2d 221, 223 (Utah 1976) (holding the district court properly denied a defendant's motion for a mistrial after a witness stated that the defendant had been incarcerated in the Utah State Prison where the statement was inadvertent,

---

6. Allen also suggests that Wright's statement was exacerbated by prosecutorial misconduct. He asserts that the prosecutor was aware of Wright's potential testimony but nevertheless improperly allowed Wright to make reference to the lie detector test, "which, in turn, allowed the jury to abdicate its all-important and difficult truth finding function." Because Allen has failed to pro-

vide relevant authority supporting his assertion that conduct such as this constitutes prosecutorial misconduct warranting a new trial, we decline to address the issue. *See Smith v. Four Corners Mental Health Ctr., Inc.*, 2003 UT 23, ¶ 46, 70 P.3d 904 (declining to address an inadequately briefed argument).

not intentionally elicited, and neither counsel nor court made further reference to it).

¶ 43 Here, the district court did not abuse its discretion in declining to grant a mistrial for many of the reasons articulated in the cases described above. First, Wright's reference to a lie detector test was not intentionally elicited or planned. Second, the reference was vague and mentioned only that Allen had been asked to take a lie detector test—not that Allen had actually taken or failed to pass such a test. Third, the reference was brief and came only near the end of a three-hour direct examination. Fourth, the proceedings continued without undue interruption. Fifth, no further attention was directed to either a lie detector test or Wright's statement. Finally, the district court offered to give the jury a curative instruction regarding the lie detector reference, which Allen declined.

¶ 44 Because we agree with the district court that Wright's statement was innocuous, we conclude that the district court did not abuse its discretion in refusing to grant Allen's motion for a mistrial.

### III. JUROR MISCONDUCT

¶ 45 We turn now to the final issue Allen raises on appeal; namely, whether the district court abused its discretion in refusing to grant a mistrial based on juror misconduct.

¶ 46 During the State's direct examination of Camille Mauerhan, a State's witness, Mauerhan testified that Allen had mentioned to her in a conversation prior to his arrest that the police refused to speak with him because he had retained an attorney. At the conclusion of this testimony and in open court outside of the presence of the jury, Allen moved for a mistrial, arguing that Mauerhan's statement that Allen had retained an attorney was prejudicial because it implied that Allen was guilty and had something to hide. Although the court ordered that the statement be stricken from the record as unresponsive and directed the jury to disregard it as such, the court declined to grant the mistrial.

¶ 47 After the jury returned a guilty verdict and Allen was sentenced to life with the possibility of parole, Allen filed a motion for a new trial, alleging juror misconduct. Allen argued that one of the jurors had learned through her spouse that defense counsel had requested a mistrial based on Mauerhan's testimony, and that the juror had subsequently relayed that information to the other jurors.

¶ 48 In its ruling on Allen's motion, the district court observed that "[i]t was inappropriate for any juror to have found out about the motion for a mistrial and also for any juror to have mentioned this to other members of the jury." However, the court also found that another juror had instructed the jury that they could not discuss the issue of a mistrial and that the jury did not, in fact, engage in any discussion regarding the mistrial motion. Based on these facts, the court concluded that Allen was not prejudiced because there was no reasonable likelihood of a different verdict absent the "somewhat innocuous" conduct of the juror. Consequently, the district court denied Allen's motion for a new trial.

¶ 49 Allen argues that the district court abused its discretion when it declined to grant his motion for a new trial. He contends that, instead of examining whether he was prejudiced by the juror misconduct, the district court should have applied the rebuttable presumption of prejudice standard articulated by this court in *State v. Pike*, 712 P.2d 277, 280 (Utah 1985). We disagree.

¶ 50 "When reviewing a [district] court's denial of a motion for a new trial, we will not reverse absent a clear abuse of discretion by the [district] court." *State v. Colwell*, 2000 UT 8, ¶ 12, 994 P.2d 177 (internal quotations omitted). "At the same time, however, we review the legal standards applied by the [district] court in denying the motion for correctness." *State v. Martin*, 2002 UT 34, ¶ 45, 44 P.3d 805.

¶ 51 Allen correctly observes that when "any unauthorized contact during a trial *between witnesses, attorneys or court personnel and jurors* ... goes beyond a mere incidental, unintended, and brief contact," there is a rebuttable presumption of prejudice, and that to counteract this pre-

sumption the prosecution must prove that the unauthorized contact did not influence the juror. *Pike*, 712 P.2d at 280 (emphasis added). However, the State also correctly notes that this rebuttable presumption only applies when the contact is between a juror and *other court participants*, not jurors and third parties unrelated to the proceedings. *Compare id.* at 279–80 (applying a rebuttable presumption of prejudice where the contact was between a juror and a witness); *State v. Erickson*, 749 P.2d 620, 620–21 (Utah 1987) (same); *State v. Anderson*, 65 Utah 415, 237 P. 941, 942–44 (1925) (same); *Logan City v. Carlsen*, 799 P.2d 224, 225–26 (Utah Ct.App. 1990) (applying a rebuttable presumption of prejudice where the contact was between a juror and the court bailiff), *with Arellano v. W. Pac. R.R. Co.*, 5 Utah 2d 146, 298 P.2d 527, 529–30 (1956) (explaining that jurors are presumed to have conducted themselves properly throughout the trial and illustrating that when an alleged contact occurs between a juror and a non-court participant, the defendant must prove that the misconduct prejudiced the defendant); *State v. Tenney*, 913 P.2d 750, 756–58 (Utah Ct.App.1996) (holding that no rebuttable presumption of prejudice attached where a juror briefly discussed the case with a coworker because "there was no impermissible contact between a juror and a witness, party, or court personnel"—only contact "between a juror and an outsider under circumstances unrelated to the proceedings"); *see also State v. Cardall*, 1999 UT 51, ¶¶ 12, 21, 982 P.2d 79 (explaining that no presumption of prejudice arose where a young witness and her mother embraced on the witness stand at the conclusion of the witness's testimony because no conversation occurred between the witness and the jurors).

¶ 52 In his reply brief, Allen concedes that the *Pike* rebuttable presumption standard applies only when the contact involves a juror and a court participant. However, he argues that the contact in this case was, for all intents and purposes, between a juror and other court participants—namely, the juror who obtained the outside information, Allen's defense counsel, and Mauerhan, the State's witness. He asserts that, "[a]lthough press reports and spouses were the mediums through which the information traveled, the contact substantially amounted to improper contact between the juror, a witness, and counsel." This argument is without merit.

¶ 53 Mauerhan and Allen's defense counsel were obviously directly involved in the events that ultimately caused the press to report on Allen's request for a mistrial. However, it is clear that the only unauthorized "contact" that occurred in this case was between a juror and her spouse. Because the misconduct did not involve contact between a juror and court personnel, the district court applied the correct legal standard. Therefore, we need only determine whether the court abused its discretion in denying Allen's motion for a new trial.

¶ 54 We conclude that the district court did not abuse its discretion. The juror's comment was apparently brief and contained no substantive information concerning the mistrial motion. Additionally, the jury did not, in fact, discuss Allen's motion for a mistrial. The district court did not abuse its discretion in concluding that, under these circumstances, Allen was not prejudiced by the inappropriate juror contact.

## CONCLUSION

¶ 55 We reject Allen's assertion that any error occurred during the course of his trial that warrants a reversal of his conviction. First, the district court did not abuse its discretion under Utah Rule of Evidence 404(b) by allowing the State to introduce evidence showing that Allen had used stolen client information to fraudulently obtain credit and purchase various items of personal property both before and after Jill's murder. Because the evidence was direct evidence of the conspiracy and illustrated Allen's preparation, plan, knowledge, and intent, it was admitted for a proper, noncharacter purpose. Additionally, the evidence was relevant, and the court acted within its discretion in concluding that the probative value of the evidence was not substantially outweighed by its prejudicial effect.

¶ 56 Second, the district court did not abuse its discretion in refusing to grant a mistrial after Wright testified that Allen had

been asked to take a lie detector test. The improper reference was not intentionally elicited or planned, was vague in its substance, and came only near the end of a lengthy direct examination. Moreover, following the reference, the proceedings continued without undue interruption, no further attention was directed to either a lie detector test or Wright's statement, and the court offered to give a curative instruction to the jury, which Allen declined.

¶ 57 Finally, the district court did not abuse its discretion in refusing to grant a new trial after discovering that a juror had improperly learned through her spouse about a defense mistrial motion. Because the unauthorized contact was between a juror and a person unconnected to the proceedings, the district court correctly evaluated Allen's new trial motion in terms of whether Allen had been prejudiced by the misconduct. Further, because the improperly obtained information contained nothing substantive about the mistrial motion and the jury did not consider the information when making its decision, the district court acted within its discretion in determining that a new trial was not warranted. Affirmed.

¶ 58 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Justice DURRANT's opinion.