2015 UT App 273

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DAVID B. SERBECK,
Appellant.

Opinion
No. 20131007-CA
Filed November 12, 2015

Third District Court, Salt Lake Department
The Honorable Elizabeth A. Hruby-Mills
No. 101907795

Nathalie S. Skibine, Attorney for Appellant

Sean D. Reyes and Jeffrey S. Gray, Attorneys
for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which JUDGES
J. FREDERIC VOROS JR. and STEPHEN L. ROTH concurred.

ORME, Judge:

¶1     David B. Serbeck (Defendant) appeals his convictions and
sentences for three counts of unlawful sexual conduct with a 16-
or 17-year-old, all third degree felonies. *See* Utah Code Ann.
§ 76-5-401.2 (LexisNexis 2012).[1] We affirm.

---

1. Because the statutory provisions in effect at the relevant times
do not differ materially from the statutory provisions now in
effect, we cite the current version of the Utah Code Annotated
for convenience.

BACKGROUND[2]

¶2      In 2007, the then seventeen-year-old victim, M.V., started visiting Defendant, her much-older neighbor, because M.V. was interested in reptiles, and Defendant kept pet snakes. That summer, one of Defendant's snakes bit M.V. After tending to the bite, Defendant and M.V. began discussing their emotional struggles. Defendant told M.V. that he suffered from post-traumatic stress disorder (PTSD) and depression, and because M.V. "was basically going through the same thing," she felt a connection to Defendant. Eventually, this conversation led to a kiss and an exchange of cell phone numbers. From there, Defendant and M.V. began texting each other daily. At Defendant's request, they also exchanged nude pictures of each other.

¶3      Ultimately, Defendant and M.V. had sexual intercourse on three separate occasions. Defendant urged M.V. not to tell anyone about their relationship and threatened to kill himself or someone else if anyone found out. M.V. complied and did not tell anyone about their relationship until that fall, when her best friend discovered the nude pictures on M.V.'s cell phone and told M.V.'s father. M.V.'s father confronted Defendant, but Defendant denied any sexual contact with M.V. M.V.'s father demanded that Defendant stay away from M.V. Instead of immediately reporting Defendant to the police, M.V.'s family decided to wait while M.V. worked through her feelings with her therapist.

¶4      Approximately two years later, in July 2009, the news media reported that Reginald Campos had shot Defendant, paralyzing him from the chest down, because Defendant had

---

2. Except as otherwise noted, "we recite the facts in the light most favorable to the jury's verdict." *State v. Martinez*, 2013 UT App 154, ¶ 2 n.1, 304 P.3d 110 (citation and internal quotation marks omitted).

followed Campos's daughter and her friend.[3] After learning of Defendant's encounter with Campos from her stepmother[4] and media accounts, M.V. decided that her relationship with Defendant should be reported to the police, having jumped to the conclusion that what had happened to her "was still happening to others." M.V.'s stepmother then reported Defendant to the police, and Defendant was charged with three counts of unlawful sexual conduct with a 16- or 17-year-old. M.V. also filed a civil lawsuit against Defendant "to get it out there for all of the other girls . . . who may have . . . interacted with [Defendant] in any way" and because she thought it might help Campos because "it was his daughter that [Defendant] was stalking."

¶5 At Defendant's criminal trial, M.V. testified that she first heard about Defendant's shooting from her stepmother and that the shooting was what prompted her to come forward. She testified that she "learned that [Defendant] was stalking someone and made the father of that person he was stalking angry and so he gets shot for it." She also testified that she knew that information was correct because she "saw it on the media." However, she also admitted that she knew that Defendant had not been charged with stalking Campos's daughter or the daughter's friend. M.V.'s stepmother testified that she told M.V. about what had happened to Defendant when she "saw on TV that the confrontation had occurred between [Defendant] and [Campos]."

---

3. A more detailed summary of the facts surrounding the Campos encounter may be found in *State v. Campos*, 2013 UT App 213, ¶¶ 3–17, 309 P.3d 1160.

4. Defendant refers to M.V.'s father's domestic partner as the father's girlfriend; the State refers to her as M.V.'s stepmother, which is the term we have chosen to use for simplicity.

¶6 Defendant testified in his own defense at trial. He acknowledged that he and M.V. talked on the phone and texted "all the time," but he claimed that they "were just friends." He denied exchanging nude pictures with M.V., although he admitted that she sent him pictures of herself in a cowboy hat and in a cheerleading outfit. He also denied kissing M.V. and having sexual intercourse with M.V. Defendant claimed that after M.V.'s father confronted him, M.V. came to his house and apologized "for everything." Defendant testified that M.V. told him she invented the sexual allegations against him "to impress her friends." Defendant admitted to having a genital piercing as described by M.V. in a police interview, but he claimed that he frequently joked about the piercing and that a lot of people knew about it, including M.V.'s father. In addition, although Defendant steadfastly denied having a sexual relationship with M.V., he claimed that M.V. told him that she was eighteen years old at the time of the alleged sexual activity.

¶7 Defendant also testified about the day he was shot. He stated that he was shot while "doing neighborhood watch" in the company of his nine-year-old daughter and the homeowners' association president. He also explained that no charges were filed against him as a result of the shooting. Before the trial court read its final instructions to the jurors, it read them a stipulation that Defendant "has not been charged with any crimes arising from allegations that he stalked or harassed an underaged girl on July 22, 2009" and that Campos was charged and convicted of attempted murder for the shooting.[5]

¶8 The jury found Defendant guilty as charged. The trial court sentenced Defendant to three indeterminate prison terms of zero to five years, with the first two sentences to run

---

5. This court reversed Campos's conviction for attempted murder, while affirming his conviction for aggravated assault. *See State v. Campos*, 2013 UT App 213, ¶ 93, 309 P.3d 1160.

consecutively and the third sentence to run concurrently with the other two. Defendant appeals.

ISSUES AND STANDARDS OF REVIEW

¶9    Defendant, represented by new counsel on appeal, first contends that his trial counsel rendered constitutionally-deficient assistance when he "failed to exclude or rebut witnesses' misleading and prejudicial accounts alleging other instances of similar misconduct." "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162.

¶10    Second, Defendant contends that the trial court erred when it "sentenced him to consecutive prison terms based in part on unreliable victim impact statements alleging a pattern of similar offenses without evidentiary basis." "[W]e review a trial court's imposition of consecutive sentences for an abuse of discretion." *State v. Fedorowicz*, 2002 UT 67, ¶ 63, 52 P.3d 1194.

ANALYSIS

I. Ineffective Assistance of Counsel

¶11    Defendant argues that his trial counsel "was ineffective when he did not exclude or rebut the allegations that [Defendant] sexually victimized [Campos's] daughter." Defendant claims that M.V.'s testimony, "along with the testimony of [M.V.'s stepmother], strongly implied that [Defendant] had sexually victimized [Campos's] daughter in a way that was similar to the allegations [M.V.] raised against [him]." Therefore, Defendant argues, trial counsel could have successfully objected to M.V.'s testimony under rules 404(b) and 403 of the Utah Rules of Evidence. Alternatively, Defendant argues that trial counsel "acted unreasonably when he failed to

rebut" "the suggestion that [Defendant] sexually victimized [Campos's daughter]."

¶12 To prevail on his claim of ineffective assistance of counsel, Defendant must show both "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). "If a defendant fails to establish either of the two parts of the *Strickland* test, counsel's assistance was constitutionally sufficient, and we need not address the other part of the test." *State v. Medina-Juarez*, 2001 UT 79, ¶ 14, 34 P.3d 187. To satisfy the first part of the *Strickland* test, Defendant must "rebut the strong presumption that under the circumstances, the challenged action might be considered sound trial strategy." *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92 (citation and internal quotation marks omitted). Given this "strong presumption of competence, we need not come to a conclusion that counsel, in fact, had a specific strategy in mind." *State v. Tennyson*, 850 P.2d 461, 468 (Utah Ct. App. 1993). "Instead, we need only articulate some plausible strategic explanation for counsel's behavior." *Id.*

¶13 Defendant's first argument is that the testimony of M.V. and her stepmother was inadmissible propensity evidence under rule 404(b) of the Utah Rules of Evidence and that trial counsel was ineffective for failing to raise an objection to that testimony. Rule 404(b) provides, in part, as follows:

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character. . . . This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Utah R. Evid. 404(b)(1)–(2). *See also State v. Allen*, 2005 UT 11, ¶ 17, 108 P.3d 730 (noting that the list of noncharacter purposes in rule 404(b) "is not exhaustive").

> Fidelity to the integrity of the rule requires a careful evaluation of the true—and predominant— purpose of any evidence proffered under rule 404(b). Thus, if [evidence] of [a proper purpose] is merely a ruse, and the real effect of prior misconduct evidence is to suggest a defendant's action in conformity with alleged bad character, . . . the evidence should not be admitted.

*State v. Verde*, 2012 UT 60, ¶ 22, 296 P.3d 673.

¶14 The first prong of the *Strickland* test requires Defendant to show that the challenged testimony was inadmissible, thus justifying a rule 404(b) objection. In deciding whether trial counsel was deficient for failing to object under rule 404(b), it is helpful to examine the context in which the challenged evidence was offered:

> [Prosecutor]: Did something happen that prompted you to decide you needed to talk about what had happened between you and [Defendant]?
>
> [M.V.]: Yes.
>
> [Prosecutor]: What was that?
>
> [M.V.]: Well, the—from the media and the incident that happened to him.
>
> [Prosecutor]: Okay. Tell me what it is that you learned about what had happened to [Defendant].

[M.V.]: I learned that he was stalking someone and made the father of that person he was stalking angry and so he gets shot for it.

[Prosecutor]: That's when [Defendant] got shot?

[M.V.]: Yes.
[Prosecutor]: After you received that information, did you decide that you wanted to talk to law enforcement about what had happened?

[M.V.]: Yes.

[Prosecutor]: Why did you decide you needed to do that?

[M.V.]: Because I saw that it was still happening to others.

Likewise, the prosecutor asked M.V.'s stepmother, "Did something happen in July of 2009 that brought all of this past about [Defendant] to come back to the forefront?" M.V.'s stepmother testified, "Well, I saw on TV that the confrontation had occurred between [Defendant] and [Campos]. And I texted [M.V.] . . . and said, you know, did you hear about what happened with [Defendant]?"

¶15 Defendant concedes that the challenged testimony "[a]rguably . . . was introduced not to prove that [Defendant] had a propensity to victimize teenage girls, but to explain why [M.V.] decided to bring charges after a two-year delay." Nevertheless, he argues that the testimony was inadmissible because it "amounted to testimony that [M.V.] came forward because she believed that [Defendant] had a propensity for victimizing teenage girls and [was] acting in conformity with bad character." The State contends that the testimony was "elicited not to prove propensity but to establish [M.V.'s] motive for coming forward two years after-the-fact." We agree with the

State and conclude that trial counsel's failure to raise a rule 404(b) objection was not deficient performance.

¶16    In this case, the State did not try to establish that Defendant had victimized Campos's daughter or that he had a propensity to victimize underage girls. M.V.'s testimony was given in response to the prosecutor's narrow questions about what prompted her to come forward when she did—some two years after her alleged sexual relationship with Defendant had ended. M.V.'s testimony was relevant background information explaining the events that culminated in her decision to come forward with allegations against Defendant. M.V.'s stepmother's testimony was offered in a similar vein.

¶17    It is all but certain that M.V. and her stepmother jumped to an erroneous conclusion. But without learning why they came forward when they did, even if their rationale was flawed, the jury might have assumed that the considerable delay in reporting was indicative of contrived allegations. *Cf. State v. Wright*, 893 P.2d 1113, 1116–17 (Utah Ct. App. 1995) (rejecting the defendant's claim that the victim's delay in reporting her rape "all but compels the conclusion that she fabricated the incident" and noting that "[t]he delay in reporting the incident is an issue that goes to [the victim]'s credibility, which is an issue for the jury"). The State was entitled to dispel this inference. Because the record demonstrates that the avowed and predominant purpose of the testimony was not to show Defendant's character or propensity to commit crimes but rather to provide necessary insight as to why M.V. came forward with allegations against Defendant when she did, the testimony was not prohibited by rule 404(b). *See Verde*, 2012 UT 60, ¶ 15 ("Under this rule, the admissibility of prior misconduct evidence depends on its avowed purpose. . . . So long as the evidence is not aimed at suggesting action in conformity with bad character, it is admissible under rule 404(b).").

¶18    Defendant has not demonstrated that the testimony was offered for an impermissible purpose. Consequently, a rule

404(b) objection would have been unavailing, and the "[f]ailure to raise futile objections does not constitute ineffective assistance of counsel." *See State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546. Thus, trial counsel's failure to object to this testimony under rule 404(b) did not amount to ineffective assistance.

¶19 Defendant next argues that M.V.'s testimony could have been excluded under rule 403 of the Utah Rules of Evidence because its probative value was outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury. According to Defendant, trial counsel was ineffective for failing to raise a rule 403 objection to M.V.'s testimony. Under rule 403, evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Utah R. Evid. 403.

¶20 Defendant contends that the probative value of M.V.'s challenged testimony was weak because she testified that her knowledge came from the media and third parties. In addition, he contends that the State's need for the testimony was minimal. According to Defendant, based on M.V.'s testimony "the jury was likely to conclude that [he] had a propensity for committing the charged crimes in the case and was therefore guilty." We disagree and conclude that the probative value of M.V.'s testimony was not substantially outweighed by the danger of unfair prejudice under rule 403.

¶21 First, M.V.'s testimony had solid probative value. *Cf. State v. Johnson*, 784 P.2d 1135, 1141 (Utah 1989) (observing that even "minimally probative evidence need not always be excluded"). M.V. alleged that she and Defendant had sexual intercourse three times, but Defendant denied any sexual contact with M.V. Thus, the State's case rested on M.V.'s credibility. And because M.V. did not come forward with allegations against Defendant until some two years after their relationship had ended, an explanation regarding her delay in reporting was useful to dispel an inference of fabrication, as previously explained. This

is especially true given that Defendant's trial counsel challenged M.V.'s credibility by arguing to the jury that M.V. made accusations against Defendant "to get one thing, to get money" and to "[g]ive [her] something to brag about. . . . Get a little attention."

¶22   More importantly, the danger of unfair prejudice from M.V.'s testimony was relatively low considering the other evidence presented at trial. The Utah Supreme Court has previously observed that "unfair prejudice results only where the evidence has an undue tendency to suggest decision upon an improper basis." *State v. Lucero*, 2014 UT 15, ¶ 32, 328 P.3d 841 (citation and internal quotation marks omitted). "Given this bar, we indulge a presumption in favor of admissibility." *Id.* (citation and internal quotation marks omitted).

¶23   Although M.V. testified on cross-examination that she knew that the reports of Defendant following girls were true, she also admitted that her so-called knowledge was based exclusively on media reports and that she knew that Defendant had not been charged with stalking.

> [Defense counsel]: Do you know if he was—you're claiming that he was following some girl. If that was the case, do you know if [Defendant] was charged with a crime?
>
> [M.V.]: Yeah, I know he wasn't.
>
> [Defense counsel]: He was not.
>
> [M.V.]: No.

In addition, the State elicited testimony from M.V.'s stepmother indicating that her knowledge of the Campos encounter was also based on media reports.

¶24   Moreover, Defendant's own testimony—undisputed in this regard—demonstrated that M.V. was seriously misinformed about the Campos case. Defendant testified that on the night he was shot, he was on neighborhood watch in the company of his nine-year-old daughter and the local homeowners' association president—unlikely companions for someone bent on a sexual encounter with teenage girls. Defendant also testified that he was never charged for anything related to the shooting.

> [Defense counsel]: And what led to you being in a wheelchair?
>
> [Defendant]: I got shot.
>
> [Defense counsel]: And tell us a little bit about that. What happened?
>
> [Defendant]: I was doing neighborhood watch with myself, homeowners' association president and my nine-year-old daughter at that time.
>
> [Defense counsel]: Okay. As a result of this shooting were any charges filed against you?
>
> [Defendant]: No.
>
> [Defense counsel]: So you have not been charged with anything related to that incident?
>
> [Defendant]: No.

¶25   Finally, the parties' stipulation was read to the jury, which stated that (1) Defendant was shot by Campos on July 22, 2009; (2) "Campos was charged with attempted murder for the July 2009 shooting and was convicted of that crime"; and (3) Defendant "has not been charged with any crimes arising from allegations that he stalked or harassed an underaged girl on July 22, 2009."

¶26 Admittedly, M.V. could have used less accusatory language in explaining why she came forward after two years of silence, especially because it is all but certain that she jumped to an erroneous conclusion regarding the events leading up to the Campos shooting. Nevertheless, Defendant has not demonstrated that M.V.'s testimony was unfairly prejudicial to the point that it should have been excluded. Accordingly, we conclude that Defendant has failed to establish that, had counsel objected to M.V.'s testimony under rule 403, the objection would have been granted, or that trial counsel's decision not to object under rule 403 was a product of unreasonable professional judgment. Thus, trial counsel's failure to object under rule 403 did not amount to ineffective assistance.

¶27 Alternatively, Defendant argues that the parties' stipulation was insufficient to rebut "the suggestion that [he] sexually victimized [Campos's] daughter." Specifically, Defendant claims that "it was unreasonable [for trial counsel] to rely on the absence of formal charges instead of explaining the reason for their absence." Defendant asserts that "[i]f counsel had asked [Defendant] additional questions about the [Campos] trial, he could have rebutted the suggestion that [Defendant] sexually victimized [Campos's] daughter" but was inexplicably not charged criminally. According to Defendant, trial counsel could have asked "follow-up" questions that would have revealed that Defendant "did not have a sexual relationship—or any relationship at all—with [Campos's] daughter"; that on the night Defendant was shot, he was only following Campos's daughter because he mistook her car for one that had been associated with recent crimes in the neighborhood; and that he only followed Campos's daughter for about three minutes, until she turned her car out of the neighborhood. Such a line of questioning would not have been unreasonable, but we disagree that trial counsel was objectively deficient for not pursuing it. He may well have made a reasonable tactical decision not to elicit additional testimony about the Campos encounter because it was essentially unrelated to the charges at issue, other than as the impetus for M.V.'s coming forward.

¶28    In this case, the jury was sufficiently apprised of the circumstances surrounding the Campos encounter, and the evidence before it was sufficient to dispel any suggestion that Defendant stalked or victimized Campos's daughter. Trial counsel addressed any suggestion of improper behavior by Defendant with the parties' stipulation, his cross-examination of M.V., and his direct examination of Defendant. *See supra* ¶¶ 23–25. Consequently, trial counsel's performance did not fall below an objective standard of reasonableness, and Defendant cannot demonstrate that his counsel's performance was deficient under *Strickland*. *See* 466 U.S. 668, 687 (1984).

¶29    Because Defendant has failed to establish deficient performance under *Strickland*, "we need not address the [prejudice] part of the test." *See State v. Medina-Juarez*, 2001 UT 79, ¶ 14, 34 P.3d 187. We conclude that Defendant's trial counsel did not render constitutionally ineffective assistance by not objecting to or further rebutting M.V.'s or her stepmother's testimony about the Campos encounter.

## II. Consecutive Sentences

¶30    Defendant next argues that the trial court "abused its discretion when it sentenced [him] to consecutive prison terms based on unreliable information concerning his history and his potential for future harm." We conclude that the trial court did not abuse its discretion in imposing consecutive sentences.

¶31    "In determining whether [sentences] are to run concurrently or consecutively, the court shall consider the gravity and circumstances of the offenses, the number of victims, and the history, character, and rehabilitative needs of the defendant." Utah Code Ann. § 76-3-401(2) (LexisNexis 2012). "[I]t is an abuse of discretion if a district court relies upon irrelevant information to reach its decision." *State v. Moa*, 2012 UT 28, ¶ 34, 282 P.3d 985.

¶32    Defendant does not contend that the trial court failed to consider the factors enumerated in section 76-3-401. *See* Utah Code Ann. § 76-3-401(2). Rather, he argues that the trial court specifically relied on two irrelevant and unreliable pieces of information at sentencing: (1) the statements of N.S., a woman who submitted a victim impact statement and a letter asserting that she was "one of the victims of [Defendant]" and that she was unable to press charges against him "because the statute of limitations [had run] by the time [she] had the courage to come forward," and (2) M.V.'s statement at sentencing that Defendant used "neighborhood watch and other programs to make him look like an outstanding person when in reality he was using that to look for victims."

¶33    To establish that the trial court abused its discretion by relying on irrelevant information at sentencing, Defendant must show "(1) evidence of reliance, such as an affirmative representation in the record that the judge actually relied on the specific information in reaching her decision, and (2) that the information she relied upon was irrelevant." *See Moa*, 2012 UT 28, ¶ 35. "Evidence, such as a judge's affirmative representation of reliance, is necessary because '[n]either our case law nor our statutes require a [district] court to make specific findings of fact in a sentencing order.'" *Id.* (alterations in original) (quoting *State v. Helms*, 2002 UT 12, ¶ 12, 40 P.3d 626). In addition, "an appellate court cannot presume there is evidence of reliance from a silent record or mere introduction of potentially irrelevant information." *Id.* "Indeed, as a general rule, we presume that the district court made all the necessary considerations when making a sentencing decision." *Id.*

¶34    Here, even assuming that M.V.'s and N.S.'s statements were irrelevant, Defendant has not shown that the trial court based its sentencing decision on those statements. There is no indication in the record that the trial court paid particular attention to their statements, and Defendant acknowledges that the trial court "did not specifically mention the allegations of multiple victims." *See id.* ¶ 40 ("A sentencing judge is not

required to articulate whether specific information was inappropriate for consideration, and the mere introduction of potentially improper information is not sufficient to establish reliance."). And although the court stated at Defendant's sentencing hearing that it had "reviewed . . . numerous letters regarding [Defendant]," it did not state that it had relied on them in making its sentencing decision. The court explained:

> The Court has reviewed the presentence report and numerous letters regarding [Defendant]. The Court is troubled by the comments that [Defendant] made during the interview with the— from the presentence report. I find those disturbing at best. They seem to be lucid. However, they seem to minimize and continue to victimize the victim in this matter.
>
> The Court is concerned that [Defendant] remains without appreciation for the impact of his criminal conduct on this very vulnerable young woman. You are not a candidate for treatment. Without meaningful and successful treatment, you remain a risk to our community.

Thus, the record indicates that the trial court imposed consecutive sentences for three reasons wholly unrelated to M.V.'s and N.S.'s statements: (1) Defendant's comments at his presentence investigation interview seemed to "minimize and continue to victimize the victim," (2) he "remain[ed] without appreciation for the impact of his criminal conduct on this very vulnerable young woman," and (3) he "remain[ed] a risk to our community"—not because he was a serial offender, but because he was not a candidate for "meaningful and successful treatment."

¶35 Defendant nevertheless argues that the trial court's conclusion that he remains a risk to the community was "likely based on N.S. and [M.V.'s] allegations that he had victimized

multiple girls." We disagree. Nothing in the record indicates that the trial court relied on these allegations as a ground for imposing consecutive sentences. The court only mentioned "numerous letters" in passing; it did not state that it had taken them into consideration in imposing sentence, *see Moa*, 2012 UT 28, ¶ 37, and we will not presume reliance from a "mere introduction of potentially irrelevant information," *id.* ¶ 35. Instead, in imposing consecutive sentences, the trial court apparently relied on the presentence investigation report, which explained that Defendant was not a good candidate for sexual offender treatment because he denied any wrongdoing with M.V., displayed no remorse for his actions, and considered himself to be the victim.

¶36 In sum, Defendant has not shown that the trial court's sentencing decision was based on irrelevant information. Thus, "[b]ecause evidence of reliance must be more than the mere presentation of potentially irrelevant information," we reject Defendant's argument on this point. *See id.* ¶ 40. Based on the record before us, we cannot conclude that it was an abuse of discretion for the trial court to impose consecutive sentences.[6]

CONCLUSION

¶37 We conclude that Defendant's trial counsel was not constitutionally ineffective when he did not object to or rebut the testimony of M.V. and her stepmother. Moreover, the trial court

---

6. Defendant also points out that he is in a wheelchair and that he has kidney and muscular problems that "render it difficult for him to just get up in the morning let alone go and cause any harm." However, while we are not unsympathetic to Defendant's confinement to a wheelchair, as the State correctly observed during oral argument his limited mobility, from all that appears, would not necessarily preclude future wrongdoing.

did not abuse its discretion in imposing two consecutive sentences and one concurrent sentence.

¶38   Affirmed.

_____