2024 UT App 89

## THE UTAH COURT OF APPEALS

JOSHUA DEE MARTIN,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20210311-CA
Filed June 21, 2024

Fourth District Court, Provo Department
The Honorable M. James Brady
No. 180401438

Joshua Dee Martin, Appellant Pro Se

Sean D. Reyes and Mark C. Field,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

LUTHY, Judge:

¶1      Joshua Dee Martin was convicted of sexually abusing his sisters-in-law. His direct appeal to our supreme court was unsuccessful. Following that appeal, Martin filed a petition, and then an amended petition (the Petition), for post-conviction relief in the district court, alleging claims of ineffective assistance of counsel. The district court granted summary judgment against Martin on his ineffective assistance claims and denied the Petition. Martin now appeals the denial of the Petition. Because we conclude as to each of Martin's ineffective assistance claims that his trial counsel (Trial Counsel) and/or his appellate counsel (Appellate Counsel) performed sufficiently, we affirm the district court's decision.

BACKGROUND[1]

¶2 Martin was charged with four counts of aggravated sexual abuse of a child for sexually abusing his young sisters-in-law, A.L. and N.L. *State v. Martin*, 2017 UT 63, ¶ 6, 423 P.3d 1254. The charges stemmed from abuse that the girls first reported in October 2012. The girls' mother (Mother) testified at an evidentiary hearing that she first learned of the abuse when N.L. told her about it during a televised religious conference for the family's church. In Mother's words, she and N.L. were alone and "in the middle of [watching] October General Conference on a Sunday afternoon session."[2] Mother said that she and N.L. were the only ones in the room when N.L. "looked up" and said, "Jesus told me I could tell you the secrets in my heart." N.L. then revealed that Martin, who was then twenty-seven years old, "had been touching her privates." N.L. was eight years old at the time of this disclosure.

---

1. Because Martin has already undergone a trial, a direct appeal, and post-conviction relief proceedings before the district court, the record before us is extensive. We limit this Background section to a review of basic facts relevant to this opinion, and we provide additional facts relevant to this opinion as appropriate in the Analysis section that follows.

2. "Semi-annually [The Church of Jesus Christ of Latter-day Saints, headquartered in Salt Lake City,] holds a religious meeting called a general conference . . . . These conferences are strictly religious in character and are for the purpose of giving doctrinal instruction to regional leaders and members of the church." *Corporation of the President of the Church of Jesus Christ of Latter-day Saints v. Wallace*, 573 P.2d 1285, 1286 (Utah 1978). The conferences, which each currently consist of five two-hour public sessions, are held during the first weekend of April and the first weekend of October. They "are communicated by radio and television [and the internet] throughout the world." *Id.*

¶3 On October 7, 2012, the day of N.L.'s disclosure, Mother gave a written report to the police. In that report, she indicated that on the day of the report, A.L. had also revealed allegations of abuse against Martin, including that every time A.L. saw Martin, he would "hug[] her and put[] [his] hands down [her] pants if no one else [was] there." A.L. was ten years old at the time of this disclosure. The girls' father (Father) also gave a written report, on or before October 23. In it, he said that Martin had admitted during a phone call that he had inappropriately touched at least one of the girls.

¶4 Both girls were interviewed at the Children's Justice Center (CJC). The State designated as an expert witness the CJC forensic interviewer who had interviewed A.L. but not N.L. (Expert). Before trial, Trial Counsel filed a motion to exclude Expert's testimony under rules 403, 608, and 702 of the Utah Rules of Evidence. At a hearing on the motion, Trial Counsel explained her[3] argument under each of these rules. "[T]he district court ruled that [Expert] was qualified as an expert on why child victims of sexual abuse often make incomplete initial disclosures and disclose additional details and facts pertaining to their sexual abuse over time." *Id.* ¶ 10. "The court also allowed [Expert] to testify regarding common behaviors . . . of children who have been abused." *Id.* (cleaned up).

¶5 During a jury trial held in July 2015, Expert testified on those subjects. She also, however, impermissibly testified that "from [her] interviews with [A.L. and N.L.], the information that they seemed to say to [her] seemed credible." She then clarified that she "only interviewed one child." Trial Counsel indicated to the court that the bolstering statement was impermissible and asked that it be stricken and a curative instruction be given to the jury. The trial court granted the motion and struck the statement,

---

3. Two attorneys—a woman and a man—represented Martin at trial. In his briefing, however, Martin uses female pronouns and appears to reference only his female counsel. Accordingly, we likewise employ female pronouns in reference to Trial Counsel.

and it also instructed the jury, "In one answer of [Expert's] testimony she commented directly on her opinion of the credibility of a particular witness in this case. This was improper and the answer has been stricken from the record. [Expert] is not qualified to give any opinion regarding the credibility of any particular witness in this case."

¶6 A.L. and N.L. also testified at trial. N.L. testified that on October 7, 2012, she and A.L. were playing bingo in their living room while watching the General Conference of The Church of Jesus Christ of Latter-day Saints when "Elder Packer[4] said that we shouldn't keep secrets, because our body's like a temple, and if you're keeping bad secrets then you're hurting your temple." So, she explained, "[she] just decided to tell." According to N.L., Mother "was fixing dinner" in the kitchen at the time and N.L. went there to tell Mother about the abuse. For her part, A.L. testified that she did not recount any specific incidents of abuse to anyone on October 7 and that "the first person" she described her allegations to was one of the CJC interviewers.

¶7 Mother also testified and agreed that N.L.'s disclosure happened during the afternoon session of the conference, but she said that "Elder Scott"[5] was speaking at the time. She also testified on cross-examination, when asked about her written report to police, that she did not remember A.L. saying that Martin put his hands down her pants every time he saw her when no one else was around.

¶8 Father testified as well. Under cross-examination, he acknowledged that, notwithstanding what he had said in his

---

4. A prominent leader in The Church of Jesus Christ of Latter-day Saints, who is also referred to as President Packer.

5. Another prominent leader in The Church of Jesus Christ of Latter-day Saints.

report to police, Martin had not affirmatively admitted to molesting the girls.

¶9     During closing argument, Trial Counsel discussed topics such as witness "coaching," "inconsistencies in [the girls'] accounts," "the impossibility of [the] allegations," "fabrication," and credibility. Regarding inconsistencies, Trial Counsel said:

> [Y]ou've heard a lot of testimony regarding the inconsistencies in [A.L.'s and N.L.'s] accounts of what they're claiming happened with my client [Martin].
>
> There are a lot of minor inconsistencies, and I'm not going to go through all of those with you. You guys have been taking notes. You can rely on your own memories and your own notes regarding those minor inconsistencies, but there are a number of major inconsistencies, or what we believe to be major inconsistencies.

She then described how A.L. had repeatedly changed her descriptions of how many incidents of abuse Martin had perpetuated against her, the order of those incidents, and the details associated with those incidents. She highlighted that many details in A.L.'s narrative had changed over time as A.L. reported them to different sources and then testified at trial. Trial Counsel then discussed inconsistencies in N.L.'s narrative as well. After this, she said, "So these are not minor . . . inconsistencies. These are major points, major changes in this testimony. We would ask that you consider that as you review the evidence in the case. Now, and again, it's not mere incomplete or partial disclosures. These are major changes." She then discussed other topics—like "the impossibility of [the] allegations"—that further supported the defense's theory of "suggestibility, fabrication, [and] coaching."

¶10    The jury convicted Martin on all four charges. *See State v. Martin*, 2017 UT 63, ¶ 14, 423 P.3d 1254. Martin appealed, and our supreme court affirmed his convictions. *See id.* ¶ 5. The supreme court determined that Trial Counsel's "defense strategy at trial was to undermine the credibility of A.L. and N.L.," including "by highlighting inconsistencies in their disclosures and testimony about his sexual abuse." *Id.* ¶ 8. And the supreme court discussed various inconsistencies that Trial Counsel had highlighted. *See id.* ¶ 9.

¶11    The supreme court also addressed Martin's argument that the district court had "made a variety of errors in admitting expert testimony by [Expert]." *Id.* ¶ 2. As to Martin's argument that "the district court erred in allowing [Expert] to testify extensively about child memory and recall," *id.* ¶ 24 (cleaned up), the supreme court determined that this argument was unpreserved, *see id.* ¶¶ 25–26. But the supreme court also stated that "what Mr. Martin characterizes as [Expert's] extensive testimony about child memory formation and recall amounted to brief remarks" that did not "call[] for expertise in the mechanisms of memory retrieval and recall" but "simply described trends and tendencies that were readily observable by a forensic interviewer with [Expert's] level of training and experience." *Id.* ¶ 27 (cleaned up). The supreme court concluded, "When her testimony is viewed in context, we do not believe that [Expert] sought to testify to psychological or neuroscientific matters beyond the scope of her expertise." *Id.*

¶12    The supreme court then tackled Martin's argument that "the district court should not have allowed [Expert] to testify regarding reasons why children will give differing disclosures of alleged abuse because this testimony was unhelpful, misleading and unfairly prejudicial and invaded the province of the jury." *Id.* ¶ 28 (cleaned up). It determined that the district court did not abuse its discretion in concluding that Expert's testimony would be helpful to the jury. *See id.* ¶ 30. It acknowledged that "there are powerful arguments why the expert testimony that the district court allowed in this case—testimony about the typical behaviors of child sex abuse victims and the manner in which they make

disclosures about their abuse—should be excluded in particular cases," but it reasoned, "Mr. Martin submitted no meaningful data or other evidence to show the district court that the testimony the district court allowed was prejudicial, unreliable, or unhelpful. Nor has he cited or sought to apply any of the myriad cases directly analyzing this nuanced and challenging problem before the district court or on appeal." *Id.* ¶ 31. It concluded, "Both at the district court level and before this court, therefore, Mr. Martin has failed to carry his burden of persuasion that admitting this testimony was an abuse of discretion." *Id.*

¶13 Finally, as relates to Expert, the supreme court discussed her improper bolstering statement, which Martin contended was grounds for a mistrial. *See id.* ¶¶ 33–34. The court determined that the statement was "plainly improper" but that Martin "waived any claim for relief on appeal" respecting it "because the district court struck [Expert's] answer and gave Mr. Martin all the relief he sought—a curative instruction stating that [Expert] was not qualified to speak to the credibility of the children and that her comments to that effect had been stricken from the record." *Id.* ¶ 34. The court stated, "Mr. Martin accordingly waived a mistrial, and we will not now give him a greater remedy than he sought at trial." *Id.*

¶14 After Martin's unsuccessful direct appeal, he filed and then amended a petition for relief under the Post-Conviction Remedies Act (PCRA). In the Petition, Martin asserted seven claims of ineffective assistance of counsel. Six of these applied only to Trial Counsel, while one applied to both Trial Counsel and Appellate Counsel. The State moved for summary judgment on each of these claims. The district court determined that none of the complained-of "actions or inactions" of Trial Counsel and Appellate Counsel were "objectively unreasonable," so it determined that addressing prejudice as to the claims was "not necessary." Because it concluded that none of the decisions in question amounted to ineffective assistance, the court granted summary judgment for the State and dismissed the Petition. Martin now appeals that decision.

## ISSUE AND STANDARD OF REVIEW

¶15    Martin asserts that the district court erred by granting the State's motion for summary judgment and denying the Petition. "We give no deference to the district court in reviewing its grant of summary judgment or its order denying a petition for post-conviction relief." *Jones v. State*, 2020 UT App 125, ¶ 18, 473 P.3d 1190. "We will affirm the grant of summary judgment when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (cleaned up); *see also* Utah R. Civ. P. 56(a).

## ANALYSIS

¶16    Martin asserts that the district court improperly granted summary judgment to the State on the claims of ineffective assistance of counsel that he raised in the Petition.[6] "In the context of a summary judgment motion in a PCRA proceeding premised on a claim of ineffective assistance of counsel, [the petitioner] bears the burden of proving [the] underlying legal claims of ineffective assistance of counsel." *Jackson v. State*, 2015 UT App 217, ¶ 13, 359 P.3d 659 (cleaned up). "When the State files its motion for summary judgment, it bears the initial burden of showing that it is entitled to judgment and that there is no genuine issue of material fact that would preclude summary judgment in

---

6. Martin was represented by attorneys from the Utah County Public Defender Association both at trial and on direct appeal. Because of this, Martin was not precluded from raising claims of ineffective assistance as to Trial Counsel in the Petition despite not raising them in his direct appeal. *See Menzies v. State*, 2014 UT 40, ¶ 212, 344 P.3d 581 ("[B]oth the common law and the PCRA allow a petitioner who had the same counsel on appeal and at trial"—including counsel from the same office or firm—"to raise ineffective assistance claims for the first time in post-conviction proceedings."), *abrogated on other grounds by McCloud v. State*, 2021 UT 51, 496 P.3d 179.

its favor." *Id.* (cleaned up). "Once the State makes that showing, the burden of proof then shifts to [the petitioner,] the nonmoving party." *Id.* (cleaned up). And because Martin, as the petitioner, "bears the burden of proving ineffective assistance, he cannot rest on his allegations alone but instead must set forth specific facts showing that there is a genuine issue for trial." *Id.* (cleaned up); *see also* Utah Code § 78B-9-105(1)(a) ("[T]he petitioner has the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.").

## I. The *Strickland* Standard

¶17　Two of Martin's assertions of error amount to general misunderstandings about how claims of ineffective assistance of counsel are evaluated. We therefore begin by explaining the test for proving ineffective assistance of counsel and why the district court did not err in its approach to applying that test in this case.

¶18　To succeed on a claim of ineffective assistance of counsel, an appellant must satisfy both prongs of the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). Under the first prong, "the defendant must show that counsel's performance was deficient," which is accomplished by showing "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88. Under the second prong, "the defendant must show that [counsel's] deficient performance prejudiced the defense." *Id.* at 687. Prejudice is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," thus "undermin[ing] confidence in the outcome." *Id.* at 694. "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [a defendant's] claims under either prong." *Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182.

¶19　In assessing whether the first prong of the *Strickland* test is met—i.e., whether counsel's performance was deficient—courts "afford[] a strong presumption that counsel's actions were within

the broad range of conduct considered a sound trial strategy." *State v. Hutchings*, 2012 UT 50, ¶ 18, 285 P.3d 1183 (cleaned up). Martin demonstrates an initial misunderstanding regarding this aspect of the *Strickland* test.

¶20 Martin contends that the district court erred by making assumptions about possible strategic reasons Trial Counsel and Appellate Counsel proceeded as they did while providing his defense. He asserts that "assumptions go both ways" and that it "can be argued" that, instead of having been based on strategic reasons, Trial Counsel's and Appellate Counsel's actions might instead reflect "unprofessional preparations, an inability to adapt to new information and focusing on inflexible tactics." But when reviewing counsel's performance, courts are "required not simply to give the attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons [they] may have had for proceeding as they did." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (cleaned up). Indeed, "given the strong presumption of competence, [a reviewing court] need not come to a conclusion that counsel, in fact, had a specific strategy in mind." *State v. Isom*, 2015 UT App 160, ¶ 37, 354 P.3d 791 (cleaned up), *cert. denied*, 364 P.3d 48 (Utah 2015). Instead, the court "need only articulate some plausible strategic explanation for counsel's behavior." *Id.* (cleaned up). Thus, rather than erring "by assuming why [Trial Counsel and Appellate Counsel] did what [they] did," as Martin contends, the district court was properly applying the first prong of the *Strickland* test when it explored and articulated possible strategic reasons for their behavior.

¶21 Martin's second misunderstanding is tied to the notion that reviewing courts are free to address an ineffective assistance claim "under either prong" of the *Strickland* test. *Honie*, 2014 UT 19, ¶ 31. Martin appears to believe that because a court need not "find counsel's performance deficient before examining prejudice," a defendant need only prove prejudice to prevail on an ineffective assistance claim. This belief is evident from his contention that the district court erred when it did not consider the purported prejudice he suffered in connection with Trial Counsel's and

Appellate Counsel's conduct and rule in his favor based on that prejudice, even though the court determined that Martin's Trial Counsel and Appellate Counsel did not render deficient performance at all. Martin's position is untenable.

¶22 While a court may address an ineffective assistance claim under only one prong of the *Strickland* test when its purpose is to show that the claim fails, a court must address both prongs of the *Strickland* test before it determines that an ineffective assistance claim is successful. *See id.* Therefore, while Martin is correct that a court need not "find counsel's performance deficient before examining the prejudice," a court must find counsel's performance deficient before it rules in a defendant's favor. And a court need not analyze prejudice at all if it first finds no deficient performance. It is the reviewing court's prerogative to analyze either prong first, and the court may end its inquiry when it deems one prong unmet. The court here found that as to each of Martin's allegations of ineffective assistance, Trial Counsel and Appellate Counsel did not perform unreasonably, thus defeating his claims on the prong of deficient performance. At that point, the court had no obligation to analyze prejudice as to any of Martin's claims.

## II. Martin's Claims of Ineffective Assistance

¶23 Having determined that the district court did not err in its general approach to applying the *Strickland* test to Martin's claims of ineffective assistance, we turn to a review of the court's specific rulings on each of Martin's claims. In the Petition, Martin raised seven claims of ineffective assistance. We examine each one to determine whether the district court correctly granted summary judgment.[7]

---

7. On appeal, Martin takes issue with several aspects of the district court's reasoning in granting summary judgment to the State. Some of Martin's arguments apply to only one claim of ineffective assistance, while others apply to multiple claims. And it is not

(continued…)

A.  The Details Surrounding N.L.'s Disclosure

¶24    Martin first contends that Trial Counsel was ineffective for failing to cross-examine N.L. regarding the identify of the television broadcast speaker and the content of the talk that prompted her disclosure of abuse, failing to cross-examine Mother on this subject, failing to seek judicial notice that the talk did not happen as described, and failing to argue fabrication on this point in closing argument. Here Martin refers to N.L.'s testimony that on October 7, 2012, she and A.L. were playing bingo in their living room while watching the conference when the following occurred: "Elder Packer said that we shouldn't keep secrets, because our body's like a temple, and if you're keeping bad secrets then you're hurting your temple. So I just decided to tell." According to N.L., Mother "was fixing dinner" in the kitchen at the time and N.L. went there to tell Mother about the abuse. Mother agreed that this happened during the afternoon session of the conference, but when asked who the conference speaker was, she said, "Elder Scott." Additionally, at an earlier evidentiary hearing, Mother had testified that she and N.L. were the only ones in the room watching the conference when N.L. "looked up and just said Jesus told me I could tell you the secrets in my heart" and then reported that "[Martin] had been touching her privates."

¶25    Martin stated in his memorandum supporting the Petition that when he heard N.L.'s trial testimony, he "immediately

---

entirely clear from his briefing whether Martin's claims of error call into question the district court's resolution of all seven ineffective assistance claims that Martin brought in the Petition. But Martin is proceeding pro se, and "appellate courts are generally lenient with pro se litigants, extending every consideration that may reasonably be indulged." *Chaparro v. Torero*, 2018 UT App 181, ¶ 33, 436 P.3d 339 (cleaned up). Because we "may, in the interests of justice, overlook inadequacies in the briefing and reach the merits" of a pro se appellant's arguments, *id.*, we elect to review all seven claims of ineffective assistance of counsel that Martin raised in the Petition.

searched the Church's website on his [phone] and informed [Trial Counsel] that the girl's detailed and specific story of the prompting she received was fabricated." Martin further asserted, "President Packer . . . was the second speaker on Sunday morning, which would mean that he gave his remarks at around 10:45 am. President Packer's address . . . [had] no reference . . . to 'secrets,' 'bodies,' or 'temples.'" Regarding Mother's description of these events, Martin stated, "Elder Scott was the second speaker during the Sunday afternoon session, so he would have spoken around 2:45 pm. His address . . . had nothing whatsoever to do with 'secrets' or 'bod[ies],' although there are several references to temples." (Alteration in original.) Martin continued, "There is the possibility that an 8-year old . . . might be confused as to the identity of the speaker who discussed human bodies being temples and not keeping secrets, but a review of all of the talks . . . reveals that not one speaker addressed those issues." Martin contended, "Choosing to ignore the clearly fabricated story of how the alleged sexual abuse came to light was not within the wide range of reasonable professional assistance of defense counsel and it was certainly not sound trial strategy." Therefore, Martin insisted, Trial Counsel performed deficiently by not cross-examining N.L. and Mother on this subject, by not seeking judicial notice that the talk N.L. referred to did not occur as described, and by not arguing fabrication on this point in closing argument.

¶26 The district court determined that Trial Counsel's actions in this regard were "not objectively unreasonable." Among the reasons it provided were that Trial Counsel "could have decided that cross-examining N.L. and [Mother] merely to point out that people listening to General Conference may be confused on the identity of the speakers was not persuasive," that Trial Counsel planned to and did highlight other inconsistencies during cross-examination and closing argument, and that Trial Counsel "could have decided that arguing about who raised the topic [was] not as significant as other aspects of the case." Considering the calculus Trial Counsel faced at the time, the court stated that "counsel is bound by the reasonable time [constraints] of the court process" as "[c]ross-examination cannot go on forever" and that Trial

Counsel "may have reasonably concluded that without showing that the content referred to by the witness was not addressed by any speaker, cross examination of the witnesses would only establish that the witness was confused as to which speaker addressed the topic." Accordingly, the court reasoned, Trial Counsel "could have reasonably weighed the trial's time [constraints], the time required to research all topics raised at the conference and the potentially limited impact of a witness['s] confusion in identity of a speaker and concluded not to pursue that line of inquiry."

¶27   Martin now contends that the court erred in "carelessly insist[ing] that [Trial Counsel] should or would [put] time adherence over [her] client['s] interests." He takes issue with the court's references to time constraints in resolving both this alleged ground of ineffective assistance and other grounds he has asserted. He declares that "it is absurd to have to say that an innocent man will be convicted because his attorney just didn't have the time to research new evidence brought up at trial or the time to properly cross-examine witnesses."

¶28   We do not read these and other time-related statements by the district court as condoning a defense attorney's inadequate research or neglect of a client's interests. Instead, we view the court's analysis as properly considering the realities of trial when evaluating attorney performance. The case law is clear that a review of attorney performance is to be undertaken "in light of all the circumstances" present when a defendant's counsel made the decision in question. *Strickland v. Washington*, 466 U.S. 668, 690 (1984); *see also Honie v. State*, 2014 UT 19, ¶ 32, 342 P.3d 182 ("[W]e examine the reasonableness of trial counsel's conduct in light of the particular facts of the case, viewed as of the time of counsel's conduct."). And decisions made in the "real-time context of trial," *State v. Nelson*, 2015 UT 62, ¶ 14, 355 P.3d 1031 (cleaned up), may involve considering the time constraints inherent in the trial setting. In preparing for and performing at a trial, "defense lawyers have limited time and resources, and so must choose from among countless strategic options. Such decisions are

particularly difficult because certain tactics carry the risk of harming the defense by undermining credibility with the jury or distracting from more important issues." *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (cleaned up).

¶29 We agree with the district court that Trial Counsel could have reasonably decided against highlighting the particular inconsistencies Martin refers to. Specifically, we agree that Trial Counsel could have reasonably determined that focusing on these inconsistencies would not be especially persuasive to the jury and could have reasonably elected to highlight other discrepancies in the evidence over these.

¶30 Even if Trial Counsel demonstrated that N.L.'s identification of the speaker and content of the talk was wrong, Trial Counsel could have reasonably concluded that the jury would likely not place much weight on an eight-year-old child's inability to correctly match one of many speakers to the content of a certain talk. And even if Trial Counsel could show that no speaker addressed the specific topic N.L. identified, it is not unreasonable to believe that an eight-year-old potentially distracted by bingo misheard, misremembered, or derived a unique interpretation from a religious address. Accordingly, Trial Counsel could reasonably believe that taking further action with regard to N.L. on this point would not be productive.

¶31 And Trial Counsel could reach a similar conclusion concerning Mother. Mother did not testify as to a particular message but rather that N.L. simply said, "Jesus told me I could tell you the secrets in my heart." Therefore, whether Mother could correctly recall the speaker was likely of little importance to the jury. And Trial Counsel could not show that Mother's identification of the speaker did not match Mother's description of the content of the speaker's talk since Mother alleged no specific content.

¶32 For these reasons, Trial Counsel did not perform deficiently by not seeking judicial notice of the content of the

various talks given in order to show that neither the speaker N.L. identified nor any of the other speakers talked about one's body being a temple and not keeping secrets. Trial Counsel could have reasonably concluded that doing so would not be effective because Mother did not point to any actual statements in the conference and the jury could reasonably believe that N.L.'s mischaracterization of the content of a talk did little to suggest fabrication of her allegations of assault.

¶33    While the discrepancies between N.L.'s account and Mother's account could lend some limited support to an allegation of fabrication, we do not see deficient performance in Trial Counsel's decision not to highlight those discrepancies where she chose to highlight other inconsistencies—ones directly related to the alleged incidents of abuse—during cross-examination and closing argument. First, we note that the jury would likely give little weight to an eight-year-old and an adult remembering differently who was speaking or who was in which room listening at a given time during the conference. And while the jury might make slightly more of the difference between N.L. testifying that she told Mother of the abuse in the kitchen while Mother was preparing dinner and Mother implying that N.L. disclosed the abuse in the living room when she and Mother were alone watching the conference, it was not unreasonable for Trial Counsel, in cross-examining N.L., to instead focus her questioning regarding the conference-time disclosure on what N.L. told Mother that day about the abuse. Specifically, Trial Counsel highlighted the fact that the abuse N.L. reported that day did not include an incident she revealed later. And in closing argument, Trial Counsel walked through a series of what she characterized as "major inconsistencies," including differences between which incidents the girls reported when and to whom, and differences in their descriptions of the incidents. Trial Counsel acted reasonably in focusing on these discrepancies and characterizing them as major, where they related specifically to Martin's alleged actions. Competent counsel could conclude that these were likely to have a greater bearing on the jury's determination of Martin's guilt than the details Martin now

focuses on regarding the conference speaker and topic because they addressed what Martin was alleged to have done and whether the girls fabricated those allegations. We therefore cannot say that Trial Counsel acted unreasonably by using the time at trial to highlight other discrepancies in the witnesses' testimonies than the conference-related ones.

## B.  The Date of A.L.'s First Disclosure

¶34    Second, Martin asserts that Trial Counsel provided ineffective assistance by failing to confront Mother and Father on cross-examination with the contradiction between, on the one hand, their accounts that A.L. told them on October 7 of specific instances of abuse by Martin and, on the other, A.L.'s trial testimony denying that she told her parents on October 7 about any abuse. Martin asserts that Trial Counsel compounded this error because she recast A.L.'s testimony as a *failure to recall* telling her parents on October 7 about abuse by Martin rather than as a *denial* that she told her parents on October 7 about the abuse and because Trial Counsel failed to highlight in closing argument this inconsistency between A.L.'s and her parents' testimonies.

¶35    Martin's argument on this point refers to the following testimony Trial Counsel elicited from A.L. during cross-examination:

> Q. . . . [W]hen you first described these events, this was the day . . . of General Conference, and [N.L.] had said some things to [Mother]. Did you talk to your family at all that day about what happened?
>
> A. No.
>
> Q. Okay, did you ever talk to them before being interviewed . . . [at] the CJC?
>
> A. No.

Q. Okay, so you don't recall talking to [Mother] or [Father] about anything?

A. No, I didn't.

Q. Okay, so you don't recall telling them that the first time this occurred was in the church parking lot in a vehicle with [Martin]; you don't remember telling them that?

A. I didn't tell them that.

This contrasts with testimony from Mother and Father, who both agreed that on October 7 A.L. did disclose details about a specific incident of abuse.

¶36 As an initial matter, we note that Martin is wrong that Trial Counsel compounded any error that might have occurred here. A.L.'s testimony in question clearly expresses A.L.'s denial—as opposed to lack of recollection—that she told her parents of specific instances of abuse on October 7, and Trial Counsel's phrasing of questions did not negate that.

¶37 As for whether Trial Counsel provided ineffective assistance for failing to cross-examine Mother and Father about this discrepancy and to highlight the discrepancy in closing argument, we conclude that she did not. That this discrepancy came in through cross-examination cuts against Martin's argument; Trial Counsel herself elicited the testimony showing yet another discrepancy. Had Trial Counsel chosen to cross-examine Mother and Father on this point, she would have risked eliciting testimony softening the discrepancy. For example, the following testimony by A.L., which preceded that quoted above, could suggest that on October 7 she perhaps acknowledged to Mother that abuse had occurred but that she did not tell Mother the details of the abuse:

Q. . . . [W]ho did you first tell about these incidents that occurred as you've described with [Martin]? Did you tell [Mother], did you tell your sister; who did you first tell?

A. Well, she asked me if he did anything, but I didn't really tell her.

Q. Sorry to interrupt you. When you say "she," are you referring to [Mother] or—

A. Yeah, [Mother].

Q. Okay. Okay.

A. I think it was . . . the girl at the CJC.

Q. Okay, so that's the first person you described all of this to?

A. Yeah.

If Trial Counsel had cross-examined Mother and Father about what, if anything, A.L. disclosed on October 7, that may have prompted the State to potentially elicit through cross-examination of A.L. a clarification that she had made some sort of disclosure to Mother on October 7, thereby narrowing the discrepancy between A.L.'s and her parents' testimonies. By instead simply eliciting contradictory testimony from A.L., Trial Counsel was able to lay a potentially sharp discrepancy bare before the jury. We cannot say that this was an unreasonable trial strategy. Nor, for the reasons we have given regarding the reasonableness of Trial Counsel's decision to focus in closing argument on discrepancies regarding the incidents of abuse themselves, can we say that Trial Counsel performed unreasonably by not specifically highlighting this disclosure-related discrepancy during closing arguments.

C. Mother's and Father's Written Police Statements

¶38　Third, Martin argued in the Petition that Trial Counsel provided ineffective assistance by not adequately confronting Mother and Father on cross-examination with the inconsistencies between their trial testimonies and their earlier handwritten statements to police and by failing to have these statements admitted and to use them in closing argument.

¶39　Mother gave a written report to the police on October 7. Father gave a written report on or before October 23. Mother's statements in her written report contained several allegations that were later contradicted at trial, including allegations discussed above regarding what A.L. disclosed that day and A.L.'s declaration that every time she saw Martin he would "hug[] her and put[] [his] hands down [her] pants if no one else [was] there." At trial, Mother testified that she did not remember A.L. saying that. Father also made statements in his police report about what A.L. had disclosed, and he further said that Martin had admitted during a phone call that he had inappropriately touched at least one of the girls. At trial, Father testified that Martin did not affirmatively admit touching either girl inappropriately.

¶40　Martin asserts on appeal that the district court addressed only Trial Counsel's failure to seek admission of these written police reports into evidence and neglected to address Trial Counsel's failure to adequately confront Mother and Father about them on cross-examination or to highlight these issues in closing argument. Martin is wrong. The court specifically listed all three of the actions Martin claimed Trial Counsel should have taken and then analyzed the appropriateness of how Trial Counsel chose to use the statements:

> Martin argues that [Trial Counsel] provided ineffective assistance of counsel by (1) failing to introduce the written statements . . . into evidence, (2) failing to adequately confront [Mother] and [Father] about inconsistencies between these

written statements and trial testimony, and (3) not pointing out inconsistencies between these statements and trial testimony to the jury. The [c]ourt finds that none of the actions or inactions by [Trial Counsel] was objectively unreasonable.

. . . [Trial Counsel] handed [Mother's] October 7, 2012 written statement to [Mother] while she was on the stand and asked her to read it silently to herself. [Trial Counsel] then proceeded to question her about the contents of the document. And she admitted that some of the things written she did not recall. [Trial Counsel] also addressed [Father's] trial testimony that Martin never affirmatively admitted he touched A.L. and N.L. with a separate written statement that contradicted this testimony.

[Trial Counsel] addressed inconsistencies in testimony with the evidence available . . . at the time. [Trial Counsel] could have also reasonably determined that if the written statements were placed in evidence, the other accusatory information would have been available for the jury to review when deliberating. [Trial Counsel] could have reasonably decided to let the witnesses' testimony speak for itself, rather than have the inculpating information available for review by the jury during deliberation. The [c]ourt finds [Trial Counsel's] actions were not objectively unreasonable . . . .

The court clearly determined that Trial Counsel was reasonable in her strategy of how to use the written police statements and did not perform deficiently by not taking the three actions Martin wishes she had.

¶41    We agree with the district court that Trial Counsel pursued an acceptable strategy regarding this evidence. Showing discrepancies between the reports and trial testimony through cross-examination, rather than seeking admission of the documents, permitted Trial Counsel to highlight only the aspects of the reports that were helpful to Martin. Trial Counsel was thereby able to cast the credibility of key witnesses of the State into doubt while avoiding putting before the jury other statements in the reports that may have been inculpatory. Trial Counsel was not ineffective for choosing a route other than admission of the documents. *See State v. Nelson*, 2015 UT 62, ¶ 16, 355 P.3d 1031 ("We give trial counsel wide latitude in making tactical decisions and will not question such decisions unless there is no reasonable basis supporting them." (cleaned up)).

¶42    And while Martin would have liked Trial Counsel to have dug deeper in cross-examination, Trial Counsel did highlight important discrepancies between the written reports and trial testimony through that process. For example, the jury heard Trial Counsel refer specifically to the written report to impeach Mother's statement that she didn't recall A.L. saying Martin would put his hand down her pants whenever other people were not around. And Trial Counsel explicitly referred to Father's written statement when confronting him about what he alleged A.L. revealed on October 7. Additionally, Trial Counsel referred to Father's written statement when questioning Father about his phone call with Martin, during which questioning Father acknowledged that Martin did not admit to molesting the girls. Based on all this, we do not find Trial Counsel's performance constitutionally defective in her cross-examination on this point.

¶43    We also do not see deficient performance in Trial Counsel not raising this point in closing argument. Trial Counsel's closing argument covered a wide range of evidence and discussed topics such as witness coaching, fabrication, inconsistencies, impossibility, and credibility. In reviewing Trial Counsel's closing argument, it is clear that Trial Counsel made a strategic decision to highlight the evidence she believed was most helpful to

Martin's defense and to cast doubt on the evidence she found most incriminating. That she and Martin had a difference of opinion over whether a particular piece of evidence should have been mentioned in closing argument is not a sufficient reason for us to conclude that Trial Counsel performed deficiently. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984) ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction . . . . There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."). Trial Counsel's closing statement constituted a robust defense of Martin, and she did not perform deficiently by making it without reemphasizing this particular point.

D. Expert's Testimony on Children's Incomplete Disclosures and Unpredictable Behaviors as a Result of Sexual Abuse

¶44 Fourth, Martin asserts that both Trial Counsel and Appellate Counsel provided ineffective assistance for not making "an adequate, reasoned and supported argument" for excluding Expert's testimony as to the reasons children make incomplete or inconsistent disclosures about sexual abuse and as to children's symptoms that are consistent with sexual abuse. We disagree and conclude that neither Trial Counsel nor Appellate Counsel performed deficiently in this regard.[8]

---

8. Martin attached Appellate Counsel's primary brief to the original version of his petition but not to the Petition as amended. Because of this, the district court found that "Martin failed to produce evidence of what [Appellate Counsel] presented and argued on appeal" and that, accordingly, the court was "without sufficient evidence to determine if [Appellate Counsel's] representation was objectively unreasonable." However, rule 65C of the Utah Rules of Civil Procedure, which governs PCRA cases, *see* Utah R. Civ. P. 65C(a), provides that "[a]ll records in the criminal case under review, including the records in an appeal of

(continued…)

¶45 Before trial, Trial Counsel filed a motion to exclude Expert's testimony. Trial Counsel argued that Expert was insufficiently qualified to give her proffered testimony, that the testimony would not be helpful to the jury, that the probative value of her testimony was substantially outweighed by a danger of unfair prejudice, and that the testimony would amount to impermissible bolstering of A.L.'s and N.L.'s testimony. Over these objections, the district court ruled that Expert "was qualified as an expert on why child victims of sexual abuse often make incomplete initial disclosures and disclose additional details and facts pertaining to their sexual abuse over time," as well as on "common behaviors . . . of children who have been abused." *State v. Martin*, 2017 UT 63, ¶ 10, 423 P.3d 1254. Expert then testified at trial "about the reasons children make incomplete or inconsistent disclosures about sexual abuse[] and explained that children respond to sexual abuse by demonstrating a wide and largely unpredictable array of behaviors." *Id.* ¶ 22. She "identif[ied] some common behavioral changes that occur in child victims of sexual abuse" but also testified that "these changes are not to be expected in every case and ultimately are not reliable indicators of whether abuse has, or has not, occurred." *Id.*

¶46 On direct appeal following Martin's conviction, Appellate Counsel largely restated Trial Counsel's arguments, contending that Expert's "testimony about the typical behaviors of child sex abuse victims and the manner in which they make disclosures about their abuse" was "unhelpful, misleading and unfairly prejudicial and invaded the province of the jury." *Id.* ¶¶ 28, 31 (cleaned up). Our supreme court concluded that based on the

---

that conviction, are deemed part of the trial court record in the petition for post-conviction relief," *id.* R. 65C(n)(3). We interpret this rule to mean that regardless of whether Martin's original petition or the Petition as amended included Appellate Counsel's briefing, we may consider Appellate Counsel's briefing since that briefing was among the records in the criminal case under review. Accordingly, we address Martin's claim of ineffective appellate assistance on its merits.

arguments forwarded by Trial Counsel and Appellate Counsel, there was "no error in the court's permitting this testimony." *Id.* ¶ 30.

¶47 The supreme court then also observed, however, that there were other "powerful arguments"—ones not made by Trial Counsel or Appellate Counsel—for "why the expert testimony that the district court allowed in this case . . . should be excluded in particular cases." *Id.* ¶ 31. Specifically, it noted that "some other jurisdictions—though by no means all—have categorically excluded this testimony in the face of evidence showing that the testimony is unreliable, is essentially beyond the scope of any credible scientific or therapeutic method, or poses an undue risk of improperly influencing a jury's assessment of credibility." *Id.* And the supreme court cited cases from two such jurisdictions. *See id.* (citing first *Sanderson v. Commonwealth*, 291 S.W.3d 610, 614 (Ky. 2009), and then *Commonwealth v. Dunkle*, 602 A.2d 830, 832, 834 (Pa. 1992), *superseded by statute as recognized by Commonwealth v. Jones*, 240 A.3d 881 (Pa. 2020)). Then the supreme court acknowledged the split in extra-jurisdictional authority and cited a case from yet another jurisdiction, *see id.*, which recognized that "a majority of the jurisdictions . . . deem admissible expert testimony that a particular complainant has exhibited behavioral characteristics identified as those of sexual assault victims—so long as the expert does not offer an ultimate conclusion on the issue of sexual abuse or opine directly on the complainant's veracity," *State v. Favoccia*, 51 A.3d 1002, 1015 n.26 (Conn. 2012). Importantly, the supreme court also cited *State v. Kallin*, 877 P.2d 138 (Utah 1994), which held that "[e]xpert testimony that [certain behavioral] symptoms are consistent with sexual abuse, subject to appropriate limitations and instructions to the jury, may enable the jury to assess the probative relevance of the evidence in light of all other evidence," *id.* at 141, *quoted in Martin*, 2017 UT 63, ¶ 31. Finally, the court concluded that because "Martin submitted no meaningful data or other evidence to show the district court that the testimony the district court allowed was prejudicial, unreliable, or unhelpful" and because Martin had not "cited or sought to apply any of the myriad cases directly analyzing this

nuanced and challenging problem before the district court or on appeal," he had "failed to carry his burden of persuasion that admitting this testimony was an abuse of discretion." *Martin*, 2017 UT 63, ¶ 31.

¶48 Martin now argues that Trial Counsel's and Appellate Counsel's failure to cite extra-jurisdictional case law excluding similar testimony as well as to cite peer-reviewed studies casting doubt on the reliability of such testimony amounted to deficient performance that prejudiced his defense. In considering this claim of ineffective assistance, we first emphasize our obligation to make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland v. Washington*, 466 U.S. 668, 669 (1984). We further emphasize that notwithstanding the extra-jurisdictional authority on the issue cited by our supreme court, at the time of Trial Counsel's and Appellate Counsel's challenged conduct, Expert's testimony was clearly admissible under controlling Utah law—specifically, *Kallin* and its progeny.

¶49 In *Kallin*, a pediatrician who had examined a child rape victim testified at trial. *See* 877 P.2d at 140. The defendant argued that the pediatrician had "improperly testified that the victim fit the profile of a sexually abused child." *Id.* at 141. In considering this argument, our supreme court discussed its previous decision in *State v. Rimmasch*, 775 P.2d 388 (Utah 1989), *superseded by rule as recognized in State v. Maestas*, 2012 UT 46, 299 P.3d 892, saying that in that case it had "held inadmissible an expert opinion that an alleged child abuse victim had been abused if the opinion was based, even in part, on conformance of a victim's behavior to a child sexual abuse profile if there was no scientific evidence establishing the scientific accuracy of the profile in identifying child sex abuse victims." *Kallin*, 877 P.2d at 140. The *Kallin* court determined that the pediatrician's "testimony was not inconsistent with *Rimmasch*" because "she did not testify that the victim had in fact been sexually abused or raped, and she did not rely on a psychological profile." *Id.* at 141 (cleaned up). Instead,

the court noted, the pediatrician "testified only that the victim's behavior was consistent with symptoms that might be exhibited by one who had been sexually abused" and did not "testify to any kind of sexual abuse profile as such, nor did she testify that the symptoms manifested by the victim demonstrated that she had been sexually abused." *Id.* The court continued, "She likewise did not testify that all sexually abused children exhibit fixed psychological or physical symptoms not otherwise present in children who have not been abused." *Id.* It explained, "Rather, her testimony was limited to the conclusion that the victim's symptoms were 'consistent with' sexual abuse. On cross-examination she also testified that the victim's symptoms were consistent with causes other than sexual abuse . . . ." *Id.*

¶50  The court reasoned, "Evidence that an alleged victim manifests certain physical symptoms that are consistent with sexual abuse is not based on a psychological sexual abuse profile. The foundation for such testimony is based on the experience and observations of those who work with abused children." *Id.* The court acknowledged that "[e]vidence that certain behavioral symptoms are consistent with sexual abuse does not prove directly the ultimate legal conclusion that the child was abused, and cannot be admitted for that purpose" because "such symptoms are also consistent with a number of causes other than sexual abuse." *Id.* But the court ultimately held that "the manifestation of certain behavioral symptoms may have some probative value as circumstantial evidence" and that "[e]xpert testimony that such symptoms are consistent with sexual abuse, subject to appropriate limitations and instructions to the jury, may enable the jury to assess the probative relevance of the evidence in light of all other evidence." *Id.*

¶51  Utah's appellate courts have since reaffirmed and applied *Kallin*'s holding. *See State v. Loose*, 2000 UT 11, ¶ 11, 994 P.2d 1237 (holding that under *Kallin* "the trial court did not err" in allowing a social worker's expert testimony that "he had seen some of the behaviors he saw in [the victim] in other children who had been sexually abused"); *State v. Burnett*, 2018 UT App 80, ¶¶ 27–31, 427

P.3d 288 (concluding that because *Kallin* allows experts to "testify that a victim's behavior is consistent with sexual abuse," an expert's testimony to that effect was admissible and "trial counsel was not ineffective for failing to object to these portions of [the expert's] testimony" (cleaned up)), *cert. denied*, 432 P.3d 1232 (Utah 2018); *State v. Christensen*, 2016 UT App 225, ¶¶ 28–29, 387 P.3d 588 (relying on *Kallin* to hold that because an expert did not testify "based on a psychological profile" or to "the ultimate legal conclusion that [the victim] was sexually assaulted," his testimony that several of the victim's "symptoms were consistent with" post-traumatic stress disorder was admissible), *cert. denied*, 390 P.3d 725 (Utah 2017).

¶52    Under *Kallin* and its progeny, Expert's testimony that, based on her experience, A.L.'s and N.L.'s symptoms were consistent with sexual abuse was clearly admissible—so long as Expert did not testify as to a certain psychological profile or to the ultimate conclusion that A.L. or N.L. had been sexually assaulted. And Expert's testimony complied with those conditions:

> At trial, [Expert] . . . testified about the reasons children make incomplete or inconsistent disclosures about sexual abuse . . . and explained that children respond to sexual abuse by demonstrating a wide and largely unpredictable array of behaviors. While she did identify some common behavioral changes that occur in child victims of sexual abuse . . . [,] she stated that these changes are not to be expected in every case and ultimately are not reliable indicators of whether abuse has, or has not, occurred.

*State v. Martin*, 2017 UT 63, ¶ 22, 423 P.3d 1254. Martin does not even argue that Expert's testimony ran afoul of *Kallin*. In other words, Martin's claim of ineffective assistance amounts to a contention that to perform competently, Trial Counsel and Appellate Counsel were required to argue for overturning *Kallin*.

¶53 While Utah courts have not previously ruled on the issue, among courts that have, the "general rule" is that defense counsel—whether trial or appellate counsel—"cannot be deemed ineffective for failing to raise an argument contrary to controlling law." Ruth Moyer, *Counsel as "Crystal Gazer": Determining the Extent to Which the Sixth Amendment Requires that Defense Attorneys Predict Changes in the Law*, 26 Geo. Mason U. C.R. L.J. 183, 194 (2016); *see also, e.g.*, *Bullock v. Carver*, 297 F.3d 1036, 1052 (10th Cir. 2002) ("We have rejected ineffective assistance claims where a defendant faults his former counsel not for failing to find existing law, but for failing to predict future law and have warned that clairvoyance is not a required attribute of effective representation." (cleaned up)); *Green v. Johnson*, 116 F.3d 1115, 1125 (5th Cir. 1997) (stating that "there is no general duty on the part of defense counsel to anticipate changes in the law" and that "counsel is not ineffective for failing to raise a claim that Texas courts have rejected repeatedly"); *Commonwealth v. Baumhammers*, 92 A.3d 708, 728–29 (Pa. 2014) (noting that the appellant was "suggesting that his counsel erred by failing to argue for a change in settled law" and holding that because "[t]rial counsel's performance is evaluated under the standards in effect at the time of trial," his counsel could not "be held ineffective for failing to request a jury instruction that was affirmatively prohibited by Pennsylvania law at the time of trial"); *State v. Febles*, 115 P.3d 629, 637 (Ariz. Ct. App. 2005) (explaining that "there is a difference between ignorance of controlling authority and the failure of an attorney to foresee future developments in the law" and holding that appellate counsel's "failure to predict future changes in the law" was not ineffective (cleaned up)). Even the United States Supreme Court has explained, in the context of the procedural default bar to federal habeas review of state court convictions,[9]

---

9. Procedural default is the sanction imposed on a federal habeas petitioner for failure to properly exhaust state remedies. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012). An exception to the doctrine of procedural default exists when the petitioner can "show[] cause for the default and prejudice from a violation of federal law," and

(continued…)

that "[i]t will often be the case that even the most informed counsel will fail to anticipate a state appellate court's willingness to reconsider a prior holding." *Smith v. Murray*, 477 U.S. 527, 536 (1986).

¶54 To be sure, a portion of our supreme court's opinion in Martin's direct appeal could be read as an indication that the court might be willing to reconsider *Kallin*. *See Martin*, 2017 UT 63, ¶¶ 31–32. But the court had given no such indication when Trial Counsel moved for exclusion of Expert's testimony or when Appellate Counsel was arguing Martin's direct appeal. In conformity, therefore, with the requirement that we resist "the temptation to second-guess trial counsel's [or appellate counsel's] decisions with the benefit of hindsight," *Honie v. State*, 2014 UT 19, ¶ 32, 342 P.3d 182, we, like other courts before us, decline to classify clairvoyance—at least under the circumstances presented here—as a component of attorney competence.[10] Hence, Martin's

one such cause for default is the "[i]nadequate assistance of counsel at initial-review collateral proceedings." *Id.* at 9–10. In *Smith v. Murray*, 477 U.S. 527 (1986), the Supreme Court, when addressing whether cause for a procedural default had been shown, held that defense counsel's failure in that case to argue for overruling established precedent was not "an error of such magnitude that it rendered counsel's performance constitutionally deficient under the test of [*Strickland*]." *Id.* at 535.

10. The leading commentator on this issue has observed that while some courts "have reiterated a *per se* rule that counsel can never be expected to be 'clairvoyant,'" other courts have followed a more nuanced rule. Ruth Moyer, *Counsel as "Crystal Gazer": Determining the Extent to Which the Sixth Amendment Requires that Defense Attorneys Predict Changes in the Law*, 26 Geo. Mason U. C.R. L.J. 183, 195 (2016). For example, the Sixth Circuit has taken a "foreshadow[ing]" approach, under which "counsel's failure to raise an issue whose resolution is *clearly foreshadowed* by existing decisions might constitute ineffective assistance of counsel." *Lucas*

(continued…)

ineffective assistance claim based on Trial Counsel's and Appellate Counsel's failure to marshal extra-jurisdictional authority and peer-reviewed studies in a bid to obtain an overruling of *Kallin* and its progeny fails.

## E. A Limiting Instruction for Expert's Testimony

¶55 Fifth, Martin argues that Trial Counsel provided ineffective assistance in neglecting to request—after the district court denied his motion to exclude Expert as an expert witness—a limiting instruction stating that (1) Expert's testimony was based on her own experience and not on research or clinical data, (2) there is no generally accepted profile or set of characteristics common to child victims of molestation, (3) Expert was not

_____

*v. O'Dea*, 179 F.3d 412, 420 (6th Cir. 1999) (emphasis added). And the Third Circuit weighed a number of factors before holding that a defendant's trial counsel performed deficiently by not anticipating the United States Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 79 (1986), which overturned precedent by holding that prosecutors could no longer use peremptory challenges to exclude potential jurors for racial reasons. *See Government of the Virgin Islands v. Forte*, 865 F.2d 59, 61–63 (3d Cir. 1989). Among the factors the Third Circuit considered were the fact that *Batson* was pending in the Supreme Court at the time of the defendant's trial, "*Batson*-like objections were being made at the time in other cases," a *Batson*-like objection "would have required little effort and would not have been a reprehensible or unprofessional act," and—most significant to the Third Circuit—the defendant had asked his counsel to make a *Batson*-like objection "to preserve his rights under a case then pending in the Supreme Court." *Id.* at 63.

We need not decide whether Utah should employ a per se approach, a foreshadowing approach, a multi-factored approach, or some other approach to this issue because given the state of Utah law at the time, Trial Counsel's and Appellate Counsel's conduct was reasonable under any reasoned approach to an attorney's obligation to predict changes in the law.

testifying as to the girls' truthfulness and legally could not do so, (4) Expert's testimony was not evidence of Martin's guilt, and (5) the jury could only consider Expert's testimony in deciding if the girls' conduct was consistent with children who had been molested. Martin bases this argument on two sources of authority: (1) our supreme court's mention of limiting instructions in *Kallin* and (2) model jury instructions from another state that Martin admits apply to evidence that is impermissible in Utah. Given this limited authority, we deem unpersuasive Martin's argument that Trial Counsel provided constitutionally ineffective assistance for not requesting this limiting instruction.

¶56 Again, in *Kallin*, our supreme court stated, "Expert testimony that [certain behavioral] symptoms are consistent with sexual abuse, subject to appropriate limitations and instructions to the jury, may enable the jury to assess the probative relevance of the evidence in light of all other evidence." *State v. Kallin*, 877 P.2d 138, 141 (Utah 1994). This statement does not require counsel to seek in every instance a limiting instruction in the face of such testimony, particularly as the *Kallin* court found no error in the lower court's admission of such testimony despite not indicating that a limiting instruction was given there. *See id.*

¶57 Additionally, the model jury instruction Martin points to is from California. Martin admits that the Utah Model Jury Instructions lack such an instruction and that the California instruction he refers to relates to evidence that is not admissible in Utah. We are not convinced that Trial Counsel provided constitutionally ineffective assistance for failing to rely on such a tenuous source for a limiting instruction. Again, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). And we are not convinced that competent counsel could only have interpreted the legal landscape on this point as requiring a limiting instruction and that Trial Counsel performed deficiently for not seeking one.

¶58 Instead of seeking a limiting instruction, Trial Counsel chose to extensively cross-examine Expert. During this cross-examination, Trial Counsel was able to obtain Expert's agreement that the children she interviews could be lying, that she cannot tell when children are lying, that children could be coached before an interview on what to say and she would not know, that children can be "over-reactive or mistaken about sex and sexual abuse," that it is possible for children to believe a false accusation after it is repeated to them enough, that abused children sometimes exhibit no behavioral changes, that children sometimes exhibit symptoms associated with sexual abuse even in the absence of sexual abuse, and that "there is absolutely no way to determine from a child's behavior" if abuse occurred. Trial Counsel's decision to limit the effect and scope of Expert's testimony through thorough cross-examination rather than through a limiting instruction was a reasonable trial strategy. Thus, Trial Counsel did not perform deficiently by choosing this route.

F. Expert's Testimony on Memory Function and Recall

¶59 Sixth, Martin asserts that Trial Counsel provided ineffective assistance by not objecting when Expert testified to things she was not permitted to testify about. In his memorandum supporting the Petition, Martin specified that he was referring to testimony regarding "memory function and recall" in children.

¶60 However, our supreme court specifically disclaimed Martin's characterization of Expert's testimony related to memory and recall:

> [W]hat Mr. Martin characterizes as [Expert's] "extensive[]" testimony about child "memory formation and recall" amounted to brief remarks that (1) children sometimes forget information and then remember it later, (2) the more children talk about events the more they remember about them, and (3) children's memories are malleable and suggestible. None of these statements called for

expertise in the mechanisms of memory retrieval and recall. Instead, these statements simply described trends and tendencies that were readily observable by a forensic interviewer with the expert's level of training and experience. When her testimony is viewed in context, we do not believe that [Expert] sought to testify to psychological or neuroscientific matters beyond the scope of her expertise.

*State v. Martin*, 2017 UT 63, ¶ 27, 423 P.3d 1254. Because Trial Counsel could have reasonably viewed this testimony just as our supreme court viewed it and, thus, believed that the objection Martin wishes she had made would have been futile, and because no other purpose related thereto—such as to ensure the issue's preservation for appeal—needed to be served, Trial Counsel acted reasonably in choosing to forgo such an objection. *See State v. Carter*, 2023 UT 18, ¶ 44, 535 P.3d 819 (stating that the "futility [of a particular action] can sometimes be a helpful way to describe why an attorney's decision was reasonable").

G. Expert's Improper Bolstering

¶61 Seventh, Martin argues that Trial Counsel provided ineffective assistance by not requesting a mistrial when Expert improperly bolstered the girls' credibility. This claim relates to the italicized language in the following exchange between Expert and Trial Counsel during cross-examination:

Q. Okay, now just to be clear, you have absolutely no professional opinion in this case whether these girls are telling the truth, correct?

A. I can't tell you if they're telling the truth or not.

Q. It's a—it's a real possibility that they're lying, correct?

A. I don't—*from my interviews with them, the information that they seemed to say to me seemed credible.*

Q. Okay, but—

A. Or at least not them. I only interviewed one child, but that's—

Q. But you just admitted that you can't tell from an interview whether they're telling the truth or not, correct?

A. Correct.

(Emphasis added.)

¶62     Martin is correct that the statement at issue was not permissible. *State v. Martin*, 2017 UT 63, ¶ 34, 423 P.3d 1254 ("[E]ven though [Trial Counsel] arguably elicited this testimony through cross-examination, we agree that it was plainly improper."); *see also State v. Ramsey*, 782 P.2d 480, 485 (Utah 1989) ("[A]n expert may not express an opinion as to a child's truthfulness with respect to statements of child sex abuse.").

¶63     However, we are not convinced that seeking a mistrial was the only reasonable action Trial Counsel could take to remedy this error. A "trial court should not grant a mistrial except where the circumstances are such as to reasonably indicate that a fair trial cannot be had and that a mistrial is necessary to avoid injustice." *State v. Butterfield*, 2001 UT 59, ¶ 46, 27 P.3d 1133 (cleaned up). And "a mistrial is not required where an improper statement is not intentionally elicited, is made in passing, and is relatively innocuous in light of all the testimony presented." *State v. Allen*, 2005 UT 11, ¶ 40, 108 P.3d 730. We believe that this last scenario describes the circumstances here and, therefore, that Trial Counsel could have reasonably believed that the court would not have granted a mistrial based on Expert's single objectionable

statement. *See generally State v. Whytock*, 2020 UT App 107, ¶ 43, 469 P.3d 1150 ("[W]e do not think [the defendant's] trial attorneys performed deficiently by failing to seek a mistrial, a remedy they could have reasonably concluded was unlikely to be awarded."), *cert. denied*, 481 P.3d 1043 (Utah 2021).

¶64    Rather than seeking a mistrial, Trial Counsel indicated to the court that the objectionable statement here was impermissible and sought that the statement be stricken and that a curative instruction be given to the jury. The district court took these steps, instructing the jury:

> You have heard testimony yesterday from [Expert], forensic interviewer for the [CJC]. In one answer of her testimony she commented directly on her opinion of the credibility of a particular witness in this case. This was improper and the answer has been stricken from the record. [Expert] is not qualified to give any opinion regarding the credibility of any particular witness in this case.

Martin asserts that the curative instruction was "ineffective and poorly worded." But it correctly stated that Expert could not opine on witness credibility, and we see no reason to believe it was ineffective, *see State v. Lee*, 2014 UT App 4, ¶ 25, 318 P.3d 1164 ("We presume that a jury followed the instructions given it unless the facts indicate otherwise." (cleaned up)).

¶65    We do not view this as a case where the inadmissible testimony likely had much impact because the statement was bookended by clear declarations that Expert could not determine generally whether the children she interviewed were telling the truth or, more specifically, whether A.L. and N.L. were telling the truth. Accordingly, the jury likely did not give much weight to Expert's inadmissible statement, and the curative instruction presumably had the effect of correcting any small impact of the statement. Trial Counsel could have reasonably believed as much

and determined that striking the offending statement and giving the curative instruction were sufficient to counter any possible harm. She could also have reasonably believed that the district court felt this way and would not grant a mistrial. Accordingly, Trial Counsel did not perform deficiently in pursuing the course she did.

### III. Cumulative Error

¶66 Finally, Martin asserts that the district court failed to consider his argument of cumulative error.

¶67 "[A] court must make three determinations before reversing a verdict or sentence under the cumulative error doctrine: it must determine that (1) an error occurred, (2) the error, standing alone, has a conceivable potential for harm, and (3) the cumulative effect of all the potentially harmful errors undermines its confidence in the outcome." *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 42, 428 P.3d 1038. "If the court determines that either a party's claim did not amount to an error, or that the claim was an error but has no potential to cause harm on its own, the claim cannot weigh in favor of reversal under the cumulative effects test." *Id.*

¶68 As we have explained, the district court correctly determined as to each of Martin's claims that Martin did not receive ineffective assistance because Trial Counsel and Appellate Counsel performed acceptably. Because there were no errors to accumulate, there was no error in the court's failure to address cumulative error.

### CONCLUSION

¶69 The district court did not err in granting summary judgment denying the Petition. The court correctly applied the legal standard applicable to claims of ineffective assistance of counsel, each of Martin's claims of ineffective assistance fail under

the deficient performance element of the *Strickland* test, and there were accordingly no errors to accumulate. We therefore affirm.

—————